IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Lishu Yin, | ) | C/A No. 3:15-3656-JMC-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Columbia International University, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The plaintiff, Lishu Yin, a self-represented litigant, filed this action pursuant to Title VII of

the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., and the Equal Pay Act of

1963, 29 U.S.C. § 206(d) against the named defendant, Columbia International University ("CIU").

This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2)

(D.S.C.) for a Report and Recommendation on Defendant CIU's motion to dismiss and motion to

strike.  (ECF No. 20.)  Yin filed a response in opposition to CIU's motion.  (ECF No. 30.)  CIU filed

a reply memorandum, (ECF No. 32), and Yin filed a sur-reply.  (ECF No. 33.)  Having reviewed the

parties' submissions and the applicable law, the court finds CIU's motion to dismiss should be

granted in part and denied in part and CIU's motion to strike should be denied.

**BACKGROUND**[1]

Yin, an Asian American originally of Chinese nationality, was employed as a full-time

resident faculty member at CIU from July 1, 2008 to June 30, 2014.  (ECF No. 1 at 4.)  She was

originally hired as a faculty member of CIU's Teaching English as a Foreign Language program

---

[1] The facts are recited from Yin's Complaint, in light of the court's duty to accept as true a
plaintiff's factual allegations when ruling on a motion to dismiss under Rule 12(b)(6).



("TEFL").  (Id. at 8.)  Yin holds a doctorate in curriculum and instruction from Mississippi State University.  (ECF No. 1-2 at 1.)

Yin alleges that from 2008 to 2011, she served as the professor of record in two courses for fellow professor Joe LeTexier, a white male, because LeTexier did not have a doctorate degree but Yin did.  (ECF No. 1 at 8.)  Yin claims she served as the professor of record despite already having a full workload.  (Id.)  In March 2011, LeTexier and other white faculty members excluded Yin from TEFL meetings where the program's curriculum was changed, despite Yin's status as the major professor and advisor in the program.  (Id. at 8-9.)  The changes to the curriculum included removing one of Yin's courses from the program of study and giving two of her other courses to white adjunct professors who did not have doctorate degrees.  (Id. at 9.)  Yin alleges this change was precipitated because she is of Chinese origin, and CIU officials believed the students she taught were more receptive to teachers whose native language was not Chinese.  (Id.)  On April 4, 2011, Yin complained to Dr. Uecker and Dr. Mitchell, both deans at CIU, that she was being mistreated by the TEFL faculty because of her race and national origin.  (Id.)

On April 11, 2011, Dr. Uecker informed Yin of the creation of the Teaching English to Speakers of Other Languages program ("TESOL"), for which Yin would serve as the major professor.  (Id. at 10.)  Following the creation of TESOL, Dr. Uecker resigned and Dr. Mitchell became the Dean of the College of Education.  (Id.)  Yin alleges that once Dr. Mitchell became dean, she began mistreating Yin.  (Id.)

In March 2012, CIU decided to merge TESOL and TEFL.  (Id.)  Yin was excluded from the meetings where the merger of the programs was planned, which Yin claims violated university policy.  (Id.)  Yin expressed her desire to Dr. Mitchell to continue the TESOL program



independently, but if not, she intended to apply for two faculty positions that were open in the College of Education. (Id.) Dr. Mitchell discouraged Yin from applying for those positions, telling her God might have another plan for her, and encouraged her to resign even though she had just renewed her employment contract. (Id.) However, Yin was later told by CIU's provost that no decision was made about combining the programs. (Id.) Further, CIU placed misleading statements in the Graduate Programs Academic Catalog to confuse prospective students and lure them into the TEFL program, and away from Yin's TESOL program, which at the time was enjoying better enrollment. (Id. at 11.)

On March 1, 2013, CIU offered Yin a new one-year contract for the upcoming school year. (Id. at 12.) However, unlike Yin's previous contracts with CIU, the new contract offer included a clause requiring her to "agree to waive her right to a civil trial." (Id.)

On March 13, 2013, Yin was asked to sit in accreditation meetings between CIU's College of Education and the South Carolina Department of Education. (Id.) Yin alleges the purpose of her presence was to prove that the College of Education had a minority professor with a doctorate degree so that the school could meet its diversity standard. (Id.) She further alleges that because CIU received a seven-year accreditation and Dr. Mitchell planned on retiring before the next round of accreditation, Dr. Mitchell no longer cared for diversity from that point on, as further evidenced by Yin's eventual termination. (Id. at 15.)

In the spring of 2013, the College of Education had hired two new faculty members, both white, despite having a budget for only one new faculty member. (Id. at 12.) Neither of the newly hired faculty members taught a class in the Fall of 2013. (Id.) Yin alleges that from this point

forward, Dr. Mitchell began to publicly and privately humiliate, threaten, and mistreat her, including the use of God's name in vain to provoke Yin to resign. (Id. at 11, 13.)

On September 20, 2013, at the end of a Dissertation Committee meeting, Dr. Mitchell dismissed Yin from the committee in front of its other members. (Id. at 13.) Dr. Mitchell stated that Yin was no longer needed because the two newly hired faculty members could take her place. (Id.) Yin attempted to meet with Dr. Mitchell about the Dissertation Committee meeting incident but Dr. Mitchell used that meeting to conduct Yin's annual evaluation a week before it was supposed to be conducted, which Yin refused to do at that time. (Id.) Yin resigned from the Dissertation Committee. (Id.) Yin alleges this incident created an offensive working environment for her. (Id.)

On September 30, 2013 Yin and Dr. Mitchell met for Yin's regularly scheduled annual evaluation. (Id.) Dr. Mitchell wrote untruthful statements on the evaluation about Yin's working relationship with the TEFL program. (Id.) When Yin refused to sign the form, Dr. Mitchell yelled at Yin and threatened her by saying, "If you don't sign it, you will see what [Provost] Jim Lanpher will do to you." (Id.) Dr. Mitchell then slammed the door shut as she left the room. (Id.) The incident made Yin cry. (Id.)

On October 2, 2013, Yin complained to CIU's provost Jim Lanpher that she was "in a disadvantage [sic] position of being a junior professor without power, a minority, a female . . . ." (Id. at 13-14.) Lanpher told Yin that he was busy and probably would not be able to schedule a meeting for several weeks. (Id.) Ultimately, Lanpher never scheduled a meeting and instead decided to lay off Yin two months later. (Id.) Yin alleges that Lanpher's decision to lay her off was causally connected to her complaints. (Id.)

On January 23, 2014, Dr. Mitchell informed Yin that due to budget cuts, the TESOL program would be eliminated and Yin's contract would not be renewed. (Id. at 15-16.) However, Yin alleges the TESOL program generated good revenue in the two prior years, and the budget problem was generated by Dr. Mitchell's hiring two new faculty members, which was all pretext to terminate Yin. (Id. at 16.) On April 3, 2014, the Provost Newsletter stated that the TESOL and TEFL programs would be combined, which Yin alleges showed Dr. Mitchell lied. (Id.) Yin further alleges that combining the programs showed that CIU discriminated against Yin because LeTexier, who taught classes in the TEFL program, was not qualified to teach graduate courses while Yin was qualified. (Id. at 16-17.)

Yin filed an internal grievance at the behest of CIU's director of human resources on April 28, 2014. (Id. at 17.) After Yin filed the grievance, Dr. Mitchell canceled Yin's farewell luncheon, which she alleges was further evidence of Dr. Mitchell's retaliation against her. (Id. at 18.) Similarly, Yin filed complaints with the South Carolina Human Affairs Commission and Equal Employment Opportunity Commission on May 15, 2014, and six days later, Dr. Mitchell excluded Yin from a faculty retreat. (Id. at 18.) Yin alleges that Dr. Mitchell's failure to invite her to the faculty retreat while she was still under contract was evidence of retaliation. (Id.)

Yin further alleges CIU measured her work productivity compared to other professors in a discriminatory manner. (Id. at 19-20.) Yin claims CIU fabricated productivity measurements and statistics as a pretext to terminate her. (Id. at 18.) Moreover, Yin alleges the workload Dr. Mitchell required of her was more than that of her white peers, all while CIU's productivity statistics showed she was the least productive faculty member. (Id. at 20.) Yin claims she was not provided extra pay for her extra workload. (Id. at 21.) For instance, white male professors in Yin's department earned



"double pay" because they were paid for dissertation review, which Yin was not able to do because she was assigned to teach more courses than those professors, and those courses accounted for less value in CIU's work productivity measurements.  (Id. at 23-24.)

After filing complaints with the South Carolina Human Affairs Commission and the Equal Employment Opportunity Commission ("EEOC"), Yin filed the instant action on September 11, 2015, alleging violations of Title VII and the EPA, and a state law defamation claim, seeking damages and costs.  (Id. at 36.)

## DISCUSSION

### A.     CIU's Motion to Dismiss

#### 1.     Motion to Dismiss Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) examines the legal sufficiency of the facts alleged on the face of the plaintiff's complaint.  Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999).  To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  A claim is facially plausible when the factual content allows the court to reasonably infer that the defendant is liable for the misconduct alleged. Id.  When considering a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint.  Erickson v. Pardus, 551 U.S. 89, 94 (2007).

The court observes that it is required to liberally construe *pro se* complaints.  Id.  Such *pro se* complaints are held to a less stringent standard than those drafted by attorneys, id.; Gordon v.



Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978), and a federal district court is charged with liberally construing a complaint filed by a *pro se* litigant to allow the development of a potentially meritorious case. Hughes v. Rowe, 449 U.S. 5, 9 (1980); Cruz v. Beto, 405 U.S. 319 (1972). When a federal court is evaluating a *pro se* complaint, the plaintiff's factual allegations are assumed to be true. Erickson, 551 U.S. at 93 (citing Twombly, 550 U.S. 544, 555-56 (2007)). The mandated liberal construction afforded to *pro se* pleadings means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so; however, a district court may not rewrite a complaint to include claims that were never presented, Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999), construct the plaintiff's legal arguments for him, Small v. Endicott, 998 F.2d 411 (7th Cir. 1993), or "conjure up questions never squarely presented" to the court, Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985).

### 2.    Ministerial Exception

CIU argues this lawsuit is barred by the ministerial exception to employment discrimination claims. The ministerial exception precludes the application of employment discrimination laws to disputes between a religious institution and its ministers. Hosanna-Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C., 132 S. Ct. 694 (2012). This judicially created exception has its roots in the Free Exercise Clause and Establishment Clause of the First Amendment. Id. at 706. The Court in Hosanna-Tabor stated,

> The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments.



> According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

Id.

To determine whether an employee qualifies as a "minister," a court must examine the circumstances of the plaintiff's employment, and not just the employee's title. Id. at 707. The circumstances considered by the Court in Hosanna-Tabor included the employee's title, the employer's and employee's representations of the employee's title and duties to the public, the employee's level of training and education in the ministry, and whether the employee's job duties reflected a role in conveying the religious institution's message and carrying out its mission. Id. at 707-08; see also Rayburn v. Gen. Conference of Seventh-Day Adventists, 772 F.2d 1164, 1169 (4th Cir. 1985) ("As a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered 'clergy.' This approach necessarily requires a court to determine whether a position is important to the spiritual and pastoral mission of the church.") (internal citations and quotations omitted); E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C., 213 F.3d 795, 801 (4th Cir. 2000).

Based on the facts alleged in the Complaint, the court cannot conclude as a matter of law at this stage of proceedings that Yin is a "minister" for the purposes of applying the ministerial exception. CIU argues Yin's essential job functions included teaching the gospel, spreading the Christian faith, and participating in worship, but no such facts were pled by Yin. Instead, the Complaint shows Yin was employed as a full-time resident faculty member of CIU's College of Education. Though CIU is a private faith-based institution of higher learning, the facts asserted in



the Complaint show that the courses Yin taught during her employment concerned teaching foreign languages, not ecclesiastical subjects. See E.E.O.C. v. Catholic Univ. of America, 83 F.3d 455, 464 (D.C. Cir. 1996) (finding the ministerial exception applied to member of an ecclesiastical faculty that instructed students in the "fundamental body of ecclesiastical laws"); Geary v. Visitation of Blessed Virgin Mary Parish Sch., 7 F.3d 324 (3d Cir. 1993) (refusing to apply the ministerial exception to a lay teacher at a Catholic church school, notwithstanding the teacher's general employment obligation to be a visible witness to the Catholic Church's philosophy and principles); DeMarco v. Holy Cross High Sch., 4 F.3d 166, 172 (2d Cir. 1993) (refusing to apply the ministerial exception to a math teacher at a Catholic high school because the relationship between employee and employer was not "so pervasively religious" that it was impossible to engage in an employment discrimination inquiry without serious risk of offending the Establishment Clause); E.E.O.C. v. Miss. Coll., 626 F.2d 477, 485 (5th Cir. 1980) (finding the faculty at a faith-based institution of higher learning were not "ministers" under Title VII just because they were "expected to serve as exemplars of practicing Christians"). Nothing in the Complaint suggests Yin received religious training or taught courses on religion. Nor does the Complaint suggest Yin played a role in conveying the institution's message or carrying out its mission. Accordingly, the court finds Yin's Complaint is devoid of any facts that show Yin is a "minister" under the ministerial exception.[2]

### 3.    Title VII Discrimination

CIU moves to dismiss Yin's disparate treatment claim under Title VII, arguing she failed to plead a viable claim. Yin appears to raise a claim of disparate treatment based on her race, sex, and

---

[2] The Court notes that with a more fully developed factual record, the application of the ministerial exception may be revisited.



national origin, stemming from her discharge. To establish a *prima facie* case for such a claim,[3] a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) her employment was terminated; (3) at the time of her termination, she was performing at a level that met the employer's legitimate expectations; and (4) her position remained open or was filled by a similarly qualified individual outside the protected class. See Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2006) (quoting Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 285 (4th Cir. 2004) (*en banc*)); see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).[4]

CIU argues Yin "wholly failed" to plead any allegations comparing her performance and qualifications to those of retained CIU employees, and her "naked and factually devoid pleading" failed to state a claim upon which the court could grant relief. The court disagrees. Yin's Complaint plainly states that her job performance was satisfactory but she was the only professor laid off out of a faculty of fifty, while two less experienced and less qualified white male American-born professors were retained within her own program. (ECF No. 1 at 16-17.) Yin provided numerous factual assertions as to the merits of her job performance, (id. at 4-6), and examples of her work productivity compared to other faculty, which she claims shows that she was terminated based on

---

[3] Yin is not required to establish a *prima facie* case at this stage of the proceedings. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002) (stating that a plaintiff in an employment discrimination case was not required to establish a prima facie case at the pleading stage to survive a motion to dismiss); McCleary-Evans v. Md. Dep't of Transp., 780 F.3d 582, 585 (4th Cir. 2015). The court cites the *prima facie* elements here only as a backdrop to determine whether her factual averments state a plausible claim of disparate treatment under Title VII.

[4] CIU urges the court to apply the standard for a disparate treatment claim in the context of a reduction in force. See Corti v. Storage Tech. Corp., 304 F.2d 336 (4th Cir. 2002). However, nothing in Yin's Complaint suggests her claim arises out of a reduction in force. In light of the standard for ruling on Rule 12(b)(6) motions to dismiss, the court will not consider Yin's claim in a reduction in force context.



her race, sex, and national origin, rather than her job performance. (Id. at 19-26.) The court finds these allegations are sufficient to state a claim for disparate treatment under Title VII based on race, sex, and national origin.

### 4.    Title VII Retaliation

CIU also moves to dismiss Yin's retaliation claim under Title VII, arguing she failed to plead a viable claim. The requisite elements for a *prima facie* case of retaliation typically include: (1) the employee engaged in a protected activity; (2) the employer acted adversely against him or her; and (3) there was a causal connection between the protected activity and the asserted adverse action. Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008); Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007). Importantly, a plaintiff must show that but for the protected activity, she would not have experienced the alleged adverse act. See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533, 2534 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation," which means "a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.").

"Protected activity" under the statute falls into one of two categories: opposition or participation. Crawford v. Metro. Gov't of Nashville & Davidson Cty., 555 U.S. 271, 274 (2009); Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 257 (4th Cir. 1998). "Oppose" means "to resist or antagonize . . . ; to contend against; to confront; resist; withstand." Crawford, 555 U.S. at 276 (quoting Webster's New International Dictionary 1710 (2d ed. 1958)). An employee need not instigate or initiate a complaint to be covered by the opposition clause. Id. at 277; see also Laughlin,



149 F.3d at 259 ("To qualify as opposition activity an employee need not engage in the formal process of adjudicating a discrimination claim.").

CIU argues Yin failed to plead that she engaged in any protected activity, suggesting she never complained "in any respect" regarding discrimination, harassment, or any conduct that would have triggered the protection of Title VII. Specifically, CIU argues Yin's email to the provost on October 2, 2013 was not a complaint because it merely stated that she was a "minority" and "female."

First, Yin is not required to establish a *prima facie* case at this stage of the proceedings. See Swierkiewicz, 534 U.S. at 511. In any event, the court concludes Yin has pled sufficient facts to state a plausible retaliation claim. Yin's Complaint states she complained about being mistreated based on her race, sex, and national origin at least three times, not just in an email to the provost. As stated in the Complaint, Yin first alleged she was being mistreated based on her race and national origin to Dr. Uecker and Dr. Mitchell on April 4, 2010. (ECF No. 1 at 9.) The Complaint suggests this allegation was made in person. (Id.) The Complaint states Yin's second allegation of mistreatment came in the form of an email to Dr. Mitchell. (Id. at 13-14.) The court rejects CIU's argument that the email "merely stated . . . that she was a 'minority' and a 'female.' " (ECF No. 20-1 at 17.) The email, which is attached to the Complaint as an exhibit, alleges Yin was "the target of being pinpointed;" "the stem of the problem and conflicts;" and that she was "in a disadvantage [sic] position of being a junior professor without any power, a minority, a female . . . ." (ECF No. 1-2 at 6.) The court finds this language tends to show Yin informed CIU officials that her status as a minority and a female put her in a disadvantaged position at work. See Okoli v. City of Baltimore, 648 F.3d 216, 224 & n.8 (4th Cir. 2011) (Title VII retaliation) (finding that the employee engaged



in a protected act under Title VII even though the employee did not use "magic words" identifying the specific trait (gender) protected under Title VII). Further, Yin claims she filed an internal grievance to CIU officials on April 18, 2014. (ECF No. 1 at 17.) The court finds Yin's allegations of her attempts to inform CIU officials of alleged discrimination is sufficient to state a plausible claim.

CIU also argues Yin failed to plead facts showing a causal connection between her protected conduct and CIU's decision to not retain her, which exceed four months between the two events. The court disagrees. First, the alleged temporal proximity of the alleged protected act and the adverse employment decision may *alone* suffice as evidence of causation, but it is not the only factor courts consider. See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001). Regardless, for the purposes of a Rule 12(b)(6) motion to dismiss, the court only need to consider the sufficiency of the facts pled, not the truth of the allegations or the weight of the evidence. See Erickson, 551 U.S. at 94. The court finds that Yin's allegation that she was terminated *because of* her complaints about a discriminatory work environment, in light of her purported productivity and qualifications, is sufficient to state a plausible claim of retaliation.

### 5.      Equal Pay Act

CIU argues Yin's "bald and cursory allegations" that CIU "played favoritism" for two newly hired white faculty members does not satisfy the pleading standards of Iqbal and Twombly for Yin's Equal Protection Claim. In essence, the Equal Pay Act prohibits discrimination between employees on the basis of sex by paying lower wages than those paid to employees of the opposite sex for substantially equal work. See 29 U.S.C. § 206(d)(1); Wheatley v. Wicomico Cty., 390 F.3d 328, 332

*PJG*

(4th Cir. 2004).  Precedent reveals that "substantially" equal means that the jobs must be more than similar or even comparable; in fact, they must be virtually identical.  Wheatley, 390 F.3d at 333-34.

To state a *prima facie* case under the Equal Pay Act, a plaintiff must show:  (1) that her employer has paid different wages to employees of opposite sexes; (2) for equal work in jobs which require equal skill, effort, and responsibility; and (3) which are performed under similar working conditions.  Brinkley v. Harbour Recreation Club, 180 F.3d 598, 613 (4th Cir. 1999), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).  Unlike Title VII, under the Equal Pay Act a plaintiff need not prove any discriminatory intent on the part of the employer.  See Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 344 & n.17 (4th Cir. 1994).

The court finds Yin pled sufficient facts to state a plausible claim under the Equal Pay Act. Yin alleges the workload Dr. Mitchell required of her was more than that of her male peers, all while CIU's productivity statistics showed she was the least productive faculty member.  (ECF No. 1 at 20.)  Yin claims she was not provided extra pay for her extra workload.  (Id. at 21.)  As an example, she alleges male professors in her department earned "double pay" because they were paid for dissertation review, which Yin was not able to do because she was assigned to teach more courses than those professors, and those courses accounted for less value in CIU's work productivity measurements, adversely affecting her pay.  (Id. at 23-24.)  The court finds these facts sufficiently state a plausible claim that she was paid less for equal work in equal working conditions.[5]

---

[5] Again, a more fully developed record may belie the merits of such a claim.  At this stage, the court merely concludes that the Complaint asserts the facts sufficient to plead a plausible claim under the Equal Pay Act.

6.     **State Law Defamation Claim**

Finally, CIU argues Yin failed to plead facts to state a plausible claim of defamation under South Carolina law.  The court agrees.  In order to prove defamation under South Carolina law, a plaintiff must show (1) a false and defamatory statement was made; (2) the *unprivileged* publication was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.  See Erickson v. Jones St. Publishers, LLC, 629 S.E.2d 653, 664 (S.C. 2006) (emphasis added) (citing Fleming v. Rose, 567 S.E.2d 857, 860 (S.C. 2002)).

Yin alleges she was defamed when CIU accused her of being the "least productive full-time faculty member."  (ECF No. 1 at 19.)  She claims CIU told this "lie" to the South Carolina Human Affairs Commission and the EEOC.  (Id.)  However, the court finds CIU's allegation that Yin was the least productive full-time faculty member was a privileged communication under South Carolina law, and therefore, the allegation was not defamatory.

In South Carolina, alleged defamatory statements that were made as part of a judicial proceeding are absolutely privileged, and thus not actionable, if they are relevant to the matter at issue in the proceeding.  See Crowell v. Herring, 392 S.E.2d 464, 466-67 (S.C. Ct. App. 1990).  This absolute privilege also applies  to preliminary steps leading to "judicial action of any official nature."  Id. at 467.  South Carolina also recognizes a "qualified" or "conditional" privilege, which protects a statement if "the matter is published upon an occasion that makes it conditionally privileged, and [. . .]the privilege is not abused."  See Murray v. Holnam, Inc., 542 S.E.2d 743, 748 (S.C. Ct. App. 2001).  Concerning the doctrine of qualified privilege, the South Carolina Supreme Court has stated,



> In determining whether or not the communication was qualifiedly privileged, regard must be had to the occasion and to the relationship of the parties. When one has an interest in the subject matter of a communication, and the person (or persons) to whom it is made has a corresponding interest, every communication honestly made, in order to protect such common interest, is privileged by reason of the occasion. The statement, however, must be such as the occasion warrants, and must be made in good faith to protect the interests of the one who makes it and the persons to whom it is addressed.

Bell v. Bank of Abbeville, 38 S.E.2d 641, 643 (S.C. 1946). "A communication made in good faith on any subject matter in which the person communicating has an interest or duty is qualifiedly privileged if made to a person with a corresponding interest or duty even though it contains matter which, without this privilege, would be actionable." Constant v. Spartanburg Steel Prods., Inc., 447 S.E.2d 194, 196 (S.C. 1994). "Where the occasion gives rise to a qualified privilege, there is a prima facie presumption to rebut the inference of malice, and the burden is on the plaintiff to show actual malice or that the scope of the privilege has been exceeded." Swinton Creek Nursery v. Edisto Farm Credit, ACA, 514 S.E.2d 126, 134 (S.C. 1999).

The court is not aware of any South Carolina cases addressing whether statements made in administrative hearings before the South Carolina Human Affairs Commission or the EEOC are absolutely or qualifiedly privileged. However, other federal courts that have addressed this issue based on analogous rules of privilege in other states have held that statements made to the EEOC in the course of litigating an employment discrimination claim are absolutely privileged. See Kettering v. Diamond-Triumph Auto Glass, Inc., 24 F. App'x 352, 358 (6th Cir. 2001) ("Under Ohio law, statements made to the Equal Employment Opportunity Commission are absolutely privileged."); Long v. Welch & Rushe, Inc., 28 F. Supp. 3d 446 (D. Md. 2014) (finding that proceedings before the EEOC give rise to an absolute privilege for otherwise defamatory statements



under Maryland law); Berstein v. Seeman, 593 F. Supp. 2d 630, 636 (S.D.N.Y. 2009) (finding an employer's submission to the EEOC was absolutely privileged under New York law because it was made in the course of litigation in a quasi-judicial proceeding); Shabazz v. PYA Monarch, LLC, 271 F. Supp. 2d 797, 804 (E.D. Va. 2003) (finding statements or information provided by a defendant to the EEOC that is relevant to the proceedings are absolutely privileged); Stith v. Chadbourne & Parke, LLP, 160 F. Supp. 2d 1, 8 (D.D.C. 2001) (finding absolute privilege applied to statements made in  EEOC proceedings, including the quasi-judicial investigatory phase of an EEOC claim).

Other federal courts that have considered this issue have found that such statements are qualifiedly privileged under analogous state laws.  See Chamblee v. Miss. Farm Bureau Fed'n, 551 F. App'x 757, 761-62 (5th Cir. 2014) (finding employer's response to claimant's charge of discrimination to the EEOC was qualifiedly privileged under Mississippi law); Stockstill v. Shell Oil Co., 3 F.3d 868, 872 (5th Cir. 1993) (finding statements made to the EEOC were entitled to a qualified privilege under Louisiana defamation law); Keeler v. ARAMARK, No. 11-1372-EFM, 2013 WL 1568039, at *7 (D. Kan. Apr. 12, 2013) (finding statements made to the EEOC and the Kansas Human Rights Commission were at least entitled to qualified privilege, but possibly absolute privilege, under Kansas law), aff'd, 536 F. App'x 771 (10th Cir. 2013).

The court finds that under South Carolina law, CIU's statement to the South Carolina Human Affairs Commission and the EEOC was at least qualifiedly privileged.  Both CIU and the government bodies had an interest and duty in reference to the subject matter of CIU's communication—namely, information provided to adjudicate Yin's complaint of discrimination. See Bell, 38 S.E.2d at 643; Constant, 447 S.E.2d at 196.  The communication between CIU and those bodies was necessary for the employment discrimination proceedings, and the court is unable



to view CIU's allegation as anything more than a good faith attempt to defend its own interest against Yin's allegations.  Cf. Conwell v. Spur Oil Co. of W. S.C., 125 S.E.2d 270, 276 (S.C. 1962) (finding that a letter written by an officer of the employer to another officer of the employer impliedly accusing the plaintiff-employee of a breach of trust in the management of the employer's funds was qualifiedly privileged because it was made between officers and employees of the employer in good faith and in the usual course of business); Fulton v. Atl. Coast Line R.R. Co., 67 S.E.2d 425, 430 (S.C. 1951) (finding a statement by the investigative officer of the employer to other officers of the company that the plaintiff was terminated for misrepresenting facts regarding his personal injury was qualifiedly privileged); Murray v. Holman, Inc., 542 S.E.2d 743, 749 (S.C. Ct. App. 2001) (finding officer's statement to employees to inform them of the reason for plaintiff-employee's termination was qualifiedly privileged because communications between officers and employees of a corporation are qualifiedly privileged if made in good faith an in the usual course of business).  Moreover, Yin has failed to allege facts indicating actual malice on the part of CIU, such that she could defeat a claim of qualified privilege.  See Swinton Creek Nursery, 514 S.E.2d at 134. Because CIU's allegation to the South Carolina Human Affairs Commission and the EEOC was at least qualifiedly privileged, the court finds Yin failed to allege facts sufficient to show a plausible defamation claim.

**B.    Defendant's Motion to Strike**

CIU moves to strike from the Complaint all of Yin's Title VII allegations that purportedly occurred before July 15, 2013 because they are time-barred.  Rule 12(f) allows the court to strike from a pleading any matter that is redundant, immaterial, impertinent, or scandalous.  Fed. R. Civ. P. 12(f).  "Rule 12(f) motions are generally viewed with disfavor 'because striking a portion of a



pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic.' " Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 347 (4th Cir. 2001) (quoting 5A A. Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1380, 647 (2d ed. 1990)).

The court finds Yin's allegations should not be stricken from the Complaint based on whether the claims the allegations support may ultimately prove to be untimely.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) (finding that a plaintiff in an employment discrimination claim may use prior time-barred acts as background evidence in support of a timely claim).  Accordingly, CIU's motion to strike pursuant to Rule 12(f) is denied.

## RECOMMENDATION

For all of the foregoing reasons, the court recommends that CIU's motion to dismiss Yin's claims against it (ECF No. 20) be granted as to Yin's defamation claim, but be denied as to Yin's remaining claims.  The court also recommends CIU's motion to strike be denied.

_____
Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

April 11, 2016
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

Page 19 of  20

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).