IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

LISHU YIN                        :
                                 :
    vs.                          :
                                 :
COLUMBIA INTERNATIONAL           :
UNIVERSITY                       :     3:15 CV 3656


    Motion hearing in the above-captioned matter held on

Thursday, July 19, 2018, commencing at 10:01 a.m., before

the Honorable Paige J. Gossett, in the United States

Courthouse, 901 Richland Street, Columbia, South Carolina,

29201.


APPEARANCES:

                    LISHU YIN, 128 Setlers Bend Court,
                    Lexington, SC, appeared pro se.

                    DANIEL H. BLOMBERG, ESQ., 1124 Park West Blvd.,
                    MT. PLEASANT, SC, appeared for defendant.

                    REGINALD W. BELCHER, ESQ., P.O. Box 1473,
                    Columbia, SC, appeared for defendant.


                    RECORDED BY KURT McKAUGHAN, ESR
              TRANSCRIBED BY DEBRA L. POTOCKI, RMR, RDR, CRR
              Official Court Reporter for the U.S. District Court
                            P.O. Box 835
                       Charleston, SC  29402

1          THE COURT:  Good morning, everyone.  This is the

2     matter of Lishu Yin versus Columbia International University.

3     This is Civil Action No. 3:15-3656.  We are here for oral

4     argument on cross-motions for summary judgment.  Those are ECF

5     numbers 144 and 159.

6        At this time I'll ask the parties or counsel to make

7     introductions for the record.  For the plaintiff, Dr. Yin?

8          DR. YIN:  Hi.

9          THE COURT:  Good morning.

10          DR. YIN:  Good morning.

11          THE COURT:  You are Lishu Yin, correct?

12          DR. YIN:  Yes, I am Lishu Yin.  Thank you.

13          THE COURT:  And you're the plaintiff and you're

14     representing yourself.

15          DR. YIN:  Yes.

16          THE COURT:  All right, thank you.  And for the

17     defendant?

18          MR. BELCHER:  Reginald Belcher with Turner Padget

19     here in Columbia, and with me is Daniel Blomberg from the

20     Becket Fund for Religious Liberty.

21          THE COURT:  Thank you.  Good morning.  Before we

22     begin, I just want to make sure, I know we have a lot of

23     people in the gallery today, and of course you are welcome,

24     federal courts are open to the public and we're happy to have

25     you.  I just want to make sure everybody understands that this

1    is an oral argument hearing on legal motions, cross-motions

2    for summary judgment, and is not an evidence hearing or a

3    trial, so there won't be any evidence or testimony taken

4    today.  This is strictly an oral argument on a legal issue

5    raised by these cross-motions for summary judgment.

6         And I'm going to hear, to start, since they are

7    cross-motions, both the plaintiff and defendant have filed

8    them, I'm going to start with the defendant.  And I believe

9    the notice of hearing allotted 20 minutes to each party.  So,

10   Mr. Belcher or Mr. Blomberg, I'll be happy to hear from either

11   of you at this time.

12        MR. BELCHER:  Judge, on behalf of CIU, Mr. Blomberg

13   would present the arguments today.  He's argued in Federal

14   Court around the country on religious liberty issues,

15   including the ministerial exception.

16        THE COURT:  All right.  Mr. Blomberg?

17        MR. BLOMBERG:  May it please the Court.

18        THE COURT:  Yes, sir.

19        MR. BLOMBERG:  My name is Daniel Blomberg, I am

20   counsel for Columbia International University, the defendant

21   in this action.

22        As the Court has already noted, we're here on

23   cross-motions for summary judgment concerning the application

24   of a ministerial exception to the decision by Columbia

25   International University to terminate Dr. Yin's employment.

1    The ministerial exception is a fundamental First Amendment

2    right that, under the religion clauses, prevents government

3    entities from being involved in the free choice of religious

4    organizations to select their ministerial staff.  And also

5    under the Establishment Clause, prevents entanglement by the

6    government in those decisions.  So it's both the Free Exercise

7    Clause and the Establishment Clause both have a part to play

8    in protecting the free choice of a religious organization

9    selecting their ministers.

10    The right was recognized in 1972 by the Fifth Circuit in

11    the McClure case, it's been recognized in the Fourth Circuit

12    since 1985 under the Rayburn decision and repeated decisions

13    after that.  And it was recognized unanimously by the United

14    States Supreme Court in the 2012 decision Hosanna-Tabor.

15    In a normal ministerial exception case you have up to

16    three issues.  The first issue is whether or not we're dealing

17    with a religious ministry, the second issue is whether we're

18    dealing with a religious minister, and the third is whether or

19    not the government action involved here would interfere with

20    the religious organization's relationship with their minister.

21    Here, the third issue is not on the table.  The District

22    Court at docket 116 has already recognized the two remaining

23    claims before this Court, the Title VII claim and the Equal

24    Pay Act claim, who are both foreclosed under the ministerial

25    exception doctrine.  And the Fourth Circuit recognized that in

1    the Hebrew Home case, and of course the Hosanna-Tabor decision

2    was dealt with in the -- explicitly addressed Title VII and

3    foreclosed Title VII.  The Hebrew Home case dealt with the

4    Fair Labor Standards Act, under which the EPA falls.  And then

5    also the Roman Catholic Diocese of Tulsa specifically

6    addressed EPA specifically.

7        And so the real issues before this Court are whether or

8    not CIU is a religious ministry, and second, whether or not

9    Dr. Yin was a religious minister.

10       So taking those in that order, first, CIU clearly is a

11   religious ministry under the test announced in Hebrew Home,

12   which is at 363 F.3d 310.  And the test there is whenever an

13   organization is marked by clear or obvious religious

14   characteristics, then that is a religious organization for

15   purposes of the First Amendment.

16       And here, they couldn't be clearer that CIU is a religious

17   organization.  For 95 years it has operated as a Christian

18   nonprofit ministry.  It provides both a biblically-based

19   education on a variety of different subject matter, and it

20   provides spiritual formation training.  In fact, that the

21   student handbook at docket 160, paragraph five, emphasizes

22   that spiritual formation is the essence of the training that

23   is received at CIU.  And so it is a devotional ministry.  The

24   goal is not just to train someone to be able to speak about

25   Christian matters, but also to live their life in a way that

1    reflects a sincere and genuine faith.

2        Every employment application at CIU states that CIU is a

3    Christian ministry dedicated to theological training and to

4    propagating biblical Christianity, and that its goal is to

5    help God's people grow in spiritual maturity, Bible knowledge

6    and ministry skills.  And that's at docket 162-11, page four.

7        So Dr. Yin, to her credit, does not strongly contest the

8    spiritual religious nature of CIU's status.  And I think

9    she -- several times she acknowledges that CIU is a Christian

10    organization that has a Christian mission.

11        THE COURT:  Mr. Blomberg, let me jump in and ask you,

12    is it fair to characterize CIU as a seminary, under the

13    general understanding of that word?

14        MR. BLOMBERG:  So, Your Honor, I think that -- It

15    certainly has a seminary.  Part of the ministry is -- part of

16    the organization is a theological school and seminary.

17        And then as compared to, say, some historically religious

18    colleges which teach solely subject matters apart from their

19    religious studies, right, so you do have some of those who may

20    be founded on religious bases, but it doesn't really influence

21    the way that the organization currently operates.  That's not

22    true for CIU.  CIU requires every undergraduate student to

23    take 30 credit hours of theological classes.

24        So I think as in -- not -- maybe not technically, but in

25    common parlance it would be considered a seminary-like school.

1          THE COURT:  And you're comparing that maybe to,

2    say -- and I don't know a lot about Georgetown University, so

3    I probably shouldn't pick on them as a comparison -- but where

4    there may be -- I mean, it's a religious school, it has a

5    religious element to it, but not every student there is

6    necessarily trained in theology or religious subjects.

7          MR. BLOMBERG:  That's right.  And a lot of religious

8    schools, genuinely religious schools, don't have this level of

9    emphasis on religious matters as does CIU.

10    But CIU sees itself as primarily focused on training

11   people for the ministry.  That's what their job is.  Other

12   religious schools don't necessarily have that kind of focus.

13   And that's one of the reasons why CIU only accepts students

14   and faculty who share their faith.  Because it doesn't make

15   sense to train, you know, a Buddhist to do Christian ministry,

16   because they don't share a Christian faith.  Right?

17    And so, again, Dr. Yin, I think correctly, acknowledges

18   CIU's Christian ministry status.  Her two counter arguments on

19   this issue are that CIU has an equal opportunity policy and

20   has received public -- some federal funding like Title VI Pell

21   grants or Title IV Pell grants.  That issue has been squarely

22   addressed by both the Petruska case out of the Third Circuit

23   in 2006, and then in the -- recently in the Grussgott case in

24   the Seventh Circuit, and this in 2018 -- sorry, 2017 -- where

25   the Court recognized that those issues -- you can't waive your

1    ministerial status, basically.  And of course it would be a

2    very broad-reaching ruling for this Court to find otherwise,

3    because there are over 100 seminaries of Catholic, Jewish and

4    Protestant backgrounds that also receive these kinds of

5    funding.  So no court has ever found that, and I think several

6    courts have directly rejected it.

7        So I think pretty clearly the question, the first

8    question, that CIU is a religious organization, is addressed

9    on the record, the complete report from this Court.  The other

10   issue that makes that an important finding is the Penn case,

11   2018 Penn case out of the Second Circuit, which we cite in our

12   briefing, specifically notes that the stronger the religious

13   status of the organization, in some ways the more it goes to

14   show the religious function of the individual.  Right?  When

15   you have a religious organization that is wholly religious,

16   then it's clearer that in an individual holds a religious

17   function.  And that's the next part of the analysis I'd like

18   to take the Court to, and that is whether or not Dr. Yin

19   served in a ministerial capacity at CIU.

20       Now, the rule here, which is set by the Rayburn case, is

21   that the Court's analysis turns primarily on the function of

22   the individual's position, what they did for the ministry.

23       And so the types of things that courts look to are whether

24   or not the individual taught or spread the faith or

25   participated in a religious ritual worship.

1    And in the Hosanna-Tabor decision, Justice Alito and Kagan

2    expressly said this means the exception applies to, quote,

3    "...any employee who serves as a messenger or teacher of a

4    religious group's faith."

5    So unsurprisingly then, courts have repeatedly found that

6    teachers at religious schools have a special religious status

7    and consistently have been found to be -- hold a ministerial

8    status.

9    THE COURT:  But not exclusively; aren't there other

10   occasions where courts have found teachers in a religious

11   school not to be ministers within the meaning of the

12   ministerial exception?

13   MR. BLOMBERG:  Absolutely, Your Honor, it's not a

14   categorical rule, it's more likely than not.  So you see this

15   in the Fourth Circuit's Diocese of Raleigh case which was

16   quoting the NLRB case from the Supreme Court, where it says,

17   "Religious teachers at religious schools hold a critical and

18   unique role."  So it doesn't mean that they're going to

19   necessarily be able to minister, but it means it's more likely

20   than not.  It's more likely than perhaps another type of

21   position, precisely because they are teaching and spreading

22   the faith in that position.  And so you've seen this apply to

23   preschool teaches in the Grussgott case, elementary teachers

24   in the Hosanna-Tabor case, elementary school principals in the

25   Fratello decision, even part-time music teachers in the

1    Diocese of Raleigh case.

2        And our position, Your Honor, I think one way of framing

3    this is that if, as in Hosanna-Tabor, a fourth grade

4    elementary school teacher who teaches religious believers

5    about the faith is a minister, then we think it stands to

6    reason that a graduate school professor who directed a program

7    on religious matters and who teaches -- and this is the

8    crucial part -- that teaches not just a generation of

9    believers, but a generation of leaders and ministers about the

10    faith, that in that context we think it makes for a very

11    strong case for ministerial function.

12        And we've identified six considerations in the briefing

13    before this court that show that Dr. Yin performed, and

14    admirably performed, a ministerial function for CIU.

15        We think the first and most important of those is the one

16    the Rayburn case identifies, and that is the essential job

17    functions that she was hired to perform and that she did

18    perform, the second is that she held a distinct religious

19    role, the third is that she led and participated in religious

20    observances such as prayer and chapel, the fourth is that she

21    had religious background, experience and training that were

22    important to her religious work, and part of the reason why

23    CIU hired her to do the work that she did.  The fifth is that

24    she was required to agree with CIU's faith, and the sixth is

25    that she modeled CIU's faith, and again, did so admirably,

1    consistently got recommendations and statements from students

2    that she did an excellent job (inaudible) the faith, and

3    showing a real heart for the ministry and heart for the

4    students she was serving.

5         So taking the first one first, the essential job functions

6    that Dr. Yin had at CIU included teaching and spreading the

7    faith, which is exactly what Rayburn says is the kind of the

8    defining characteristics of a minister.  And Dr. Yin, again,

9    acknowledged this at her deposition, that her work helped

10   further, quote, "advancing God's kingdom," end quote, and,

11   quote, "spreading Christianity," end quote.  And that's at

12   docket 163, page 41.

13        And she was right.  Dr. Yin was hired to participate in

14   and then ultimately in 2011, lead part of CIU's ESL program,

15   which is a program of teaching English as a second language

16   program.  That was a program that had a very important

17   ministerial function.  The reason why CIU started it was

18   because it allowed them to spread the faith in places that

19   were harder to reach if you wearing, say, a Roman collar, not

20   that CIU graduates would be wearing a Roman collar, but you

21   get my point, that a formal minister wouldn't be able to reach

22   those populations in the same way that someone who is coming

23   in as an English teacher would be able to.

24        And, in fact, skipping ahead a little bit, this was

25   precisely one of the reasons why CIU hired Dr. Yin, because

1    her own conversion to the faith resulted from the work of an

2    ESL teacher in China, and then she was motivated and she came

3    to CIU and said I had this experience, and I want to help

4    bring this experience here.  And CIU was very excited about

5    that, because in a lot of ways it puts skin on what they were

6    trying to do with the program, and that was help prepare

7    people so they could spread the faith in places that would

8    otherwise have difficulty receiving it.

9        Each of the formal job documents that spelled out the

10    essential job functions, the contract, the job description,

11    the application, the faculty handbook, the engagement letter,

12    and all the evaluations that were performed, including her

13    own, also go through and very clearly identify the religious

14    functions that were inherent in the position.

15        So starting with the contract at docket 159-11, the

16    contract said, "It is important for the faculty to provide

17    religious leadership for students by instruction and example."

18    So she was being hired to perform a religious leadership role,

19    which is a quintessential ministerial function.  And CIU was

20    also clear that her agreement to follow their religious

21    beliefs and religious lifestyle were essential job functions,

22    they were bona fide occupational qualifications.  If she

23    didn't share the faith and she didn't live the faith, then she

24    couldn't do the work that CIU needed her to do in that

25    position.

1    The contract also reserves a right under federal law to

2    make employment decisions on those religious criteria, which

3    of course for a secular employer would be impermissible.

4    The job description also is very clear about this, docket

5    162-16, where it said part of a job was enabling student

6    growth in biblical knowledge, spiritual maturity and ministry

7    orientation.  The first specific requirement was that she

8    would model Christ-like living and service.  And one of the

9    job skills required was that she would foster students'

10    spiritual growth and ministry skills.  The application also

11    was very clear on this issue.  The application that she filled

12    out, and also had recommendations received from, at docket

13    162-13, the very first page of the application again repeated

14    that CIU is a Christian ministry dedicated to theological

15    training and spreading faith, propagating Christianity.

16    And the reference document, the document that was given to

17    the religious reference, and Professor Yin, Dr. Yin provided

18    four pastoral references, asked if the individual would be a

19    good fit for a ministry, quote, "devoted primarily to the

20    training of full-time vocational Christian workers."  So

21    they're asking her, can she come in and help train ministers

22    to do ministry?  And she got a glowing review, because again,

23    she has a strong faith, as evidenced in the record.  The

24    faculty handbook also showed this.  At docket 161-1, page 40,

25    the Educational Philosophy and Responsibilities Guide said,

1  quote, "The teacher should accept the faculty role as a

2  ministry in the biblical sense, and never consider it just to

3  be a mere job."

4      And it goes on to say that the faculty should employ

5  prayer as a basic professional tool.  Again, these aren't the

6  things that you would ask of a math teacher at a secular

7  institution.  These are the requirements at CIU because of the

8  religious mission, because of the religious role that

9  Professor Yin or Dr. Yin held.

10     Also the engagement letter.  So when CIU hired her, they

11 gave her the engagement letter that said, docket 159-9, it

12 says, "I am very grateful that God has led you to join the

13 team here at CIU, and pray that your ministry among us will be

14 long, fruitful and strategic."  And specifically says what

15 she's being hired to do is invest her life in training men and

16 women to the task of world evangelism.  Again, spreading the

17 faith.  This is what the Rayburn test is all about.

18     And the Bell case that the Fourth Circuit decided in 1997

19 at 126 F.3d at 332, specifically identifies an engagement

20 letter that highlights the ministerial status as evidence of

21 that status.

22     And so then you also see it in the -- in each of the

23 evaluations that are performed, the evaluations from her

24 supervisors, the evaluations that Dr. Yin performed for

25 herself, and also the evaluations from her students, again

1   reaffirming the core religious function that Dr. Yin admirably

2   performed for CIU.

3        At docket 162-17, the 2008-2009 supervisor evaluation

4   evaluated her -- this is one of her essential job functions --

5   on whether or not she integrates Christian perspective and

6   biblical material into courses and enables students to have a

7   Christian viewpoint to their profession.  And the supervisor

8   evaluated her as exemplified her ability to present material

9   from a biblical perspective.

10       And then also was evaluated on whether or not she modeled

11  Christ-like living and ministry, and was evaluated very very

12  positively on doing that job very well.  In her

13  self-evaluation from 2011-2012, docket 159-14, at page three,

14  Dr. Yin identified a number of religious functions that she

15  performed that semester.  She met with each student and prayed

16  for them specifically.  She incorporated CIU's goals, its

17  religious ministerial goals, quote, "into every class."

18       She encouraged students to follow the Lord's calling and

19  to live out the faith.  She formed prayer groups for the

20  students from day one of the classes, and required the

21  students to attend those prayer groups at least seven times a

22  semester, and also for at least an hour each time.  And she

23  set an example.  She said, "I set an example to demonstrate

24  Christian disposition," and she was fostering every student to

25  grow spiritually.

1      So again, these are strong indications of the religious
2  ministerial role that she held.
3      The student evaluations that are in the record as well,
4  docket 160, paragraph 58, said most of the students in her
5  class came to her for some form of ministerial training.
6  Their ultimate objective in coming to CIU and getting the
7  degree they were getting and participating in the program and
8  then graduating, was to have some formal ministerial training.
9  About 80 percent, 79 percent said that's why they were in her
10  class.  And the evaluation rated her positively on covering
11  matters such as world evangelization, spiritual formation.
12      So those are just the formal documents, Your Honor, that
13  are before this Court, the contract, the engagement letter,
14  all those kind of documents.  But also exists in the
15  substantive record of what Dr. Yin actually did.  She admits
16  and she acknowledges in her response brief at pages 19, 24 and
17  28, that she taught a, quote, "biblical world view," and that
18  she was required to do so.  That if she hadn't done so, CIU
19  would have either given her a poor review or perhaps even
20  terminated her for that reason, which of course it did not, it
21  did not terminate her for that reason.  In fact, she did do an
22  excellent job providing a world biblical view in her classes.
23      And again, as I mentioned earlier, she said at docket
24  159-14, that she did this in every class.
25      Now, she also designed a flier for her program, the M.A.

1    TESOL program that she led, docket 162-15, stating that

2    graduates of her program would have, quote, "ministry

3    opportunities which would include, quote, 'the ability to use

4    English teaching as ministry.'"

5        And then, as the CIU's briefing shows at pages 13 through

6    14 of the opening brief, all of her curricula identified

7    religious functions and religious participation in the class.

8    I think one of the key examples is the book she assigned to

9    her students to read the, "English Teaching as Christian

10   Mission:" quote, "An Applied Theology."  And that's at docket

11   162-8.  They were studying this book to understand how they

12   use the training in the classroom to do ministry outside the

13   classroom afterwards.

14       THE COURT:  So on that point, is it -- you're saying

15   that Dr. Yin was teaching English, I guess, as a second

16   language to students, so that they could, I guess, go out into

17   the world and communicate in English to spread the message of

18   their faith.  Is that fair?

19       MR. BLOMBERG:  Yes, Your Honor.  And two things about

20   that.  So one was teaching them the substantive skill set so

21   they could teach English as a second language, right, which

22   isn't inherently necessarily religious, but the purpose for

23   which she taught it and the purpose for which the students

24   received it was so that they could use that as a way of

25   opening -- I think the term that was used by CIU is a

1  tent-making ministry.  So the Apostle Paul, who made tents,

2  but also spread the gospel, uses an opening that allowed him

3  to spread the gospel in that way.  And that's in CIU's

4  briefing.

5      And the other thing that Dr. Yin was doing in her classes

6  was also working on the spiritual formation of her students.

7  Because remember, CIU has both components to how they do

8  ministry.  One is teaching about the -- the substantive course

9  content, but the other is also training the student to have a

10 strong devotional relationship with the Lord.  And so that's

11 one of the reasons why, at the start of every class, Dr. Yin

12 would open the class in prayer.  And she instructed the

13 students that they would pray as a part of her program,

14 because, quote, "we believe prayer is vital to ministry."

15 That's docket 163-4.

16     So, Your Honor, we think that on that basis alone, given

17 the very strong record of religious function that Dr. Yin

18 performed for CIU, that this Court can find that Dr. Yin held

19 a ministerial role.  But we think it goes further than that.

20 There's five other considerations here.  Just to take a couple

21 of them --

22          THE COURT:  And you are out of time, so make it

23 really fast.

24          MR. BLOMBERG:  Very fast, Your Honor.  Very fast,

25 Your Honor.  I think she held herself out as having a

1    ministerial role, a role that's distinct from her students,

2    where she said, I am your adviser, I am your program director,

3    I am your official shepherd.  That was docket 163-9.

4        She specifically informed students and supporters that

5    they equip students with skills to integrate biblical

6    principles into whatever they taught.  And she specifically

7    said that her TESOL program will prepare you, the student, to

8    be a Christian educator.

9        Your Honor, in closing, I just want to emphasize, CIU did

10   not terminate Dr. Yin because of problems with her

11   performance.  She was an excellent educator for the school.

12   CIU terminated Dr. Yin's employment because of a financial

13   issue, a financial time that the CIU was going through.  There

14   were 28 individuals who were also terminated the exact same

15   time, 50 over the course of that calendar year.  And but that

16   doesn't change the fact that the ministerial exception fully

17   applies here.  In fact, the Bell case directly addressed this

18   kind of issue where the termination there was expressly and

19   solely the reduction in force, it was solely for financial

20   reasons and not at all for performance reasons.  And what the

21   Bell case said, at 126 F.3d page 328, was that was a decision

22   that was protected under the ministerial exception.

23       So, Your Honor, for those reasons we urge the Court to

24   grant summary judgment to CIU.

25           THE COURT:  Thank you, Mr. Blomberg.

1    MR. BLOMBERG:  Thank you.

2    THE COURT:  Dr. Yin?

3    DR. YIN:  Your Honor, can I stay here?

4    THE COURT:  You may.

5    DR. YIN:  Yes, thank you very much, Your Honor, for

6    this hearing opportunity.

7    At this moment I'm not going to counter argument.  And I'm

8    going to talk about the policies and the guide, and a little

9    bit background to this case.

10    And about 25 years ago, with my parents' encouragement and

11    support, I came to America to study.  The reason my parents

12    supported me was because they did not want me to go through

13    the kind of persecution they went through in China.  They

14    hoped the best for their daughter to live in a land that has

15    liberty and justice for all, that has a legal system to

16    protect every individual's rights.

17    And today I'm -- never did they know and never did I know

18    today I'm standing here fighting for justice and seeking

19    justice to be served.  Today I'm presenting facts and the

20    truth.  I'm not presenting arguments to the Court.  And I'm

21    confident truth will come out and prevail.

22    THE COURT:  Let me just stop you right there, Dr.

23    Yin, because I want to make sure you understand.  You just

24    told me that you want to present facts and not argument, but

25    the purpose of today's hearing is for you to make argument

1      regarding the law and --

2            DR. YIN:  Yes, okay.

3            THE COURT:  -- why this ministerial exception that is

4      a part of the law, shouldn't apply to you.  And I know you're

5      going to need to tell me some facts to explain that, but I

6      want to make sure you understand that today is not a trial.

7            DR. YIN:  Okay.

8            THE COURT:  It's not an evidentiary hearing, it's not

9      your day to argue that you were unfairly terminated.  It's not

10     your trial on the merits.  This is simply a hearing on a legal

11     issue.  So I'm going to ask you to confine the facts that you

12     want to tell me about to the application of that ministerial

13     exception that is at issue today.

14           DR. YIN:  Okay.  Thank you, Your Honor.  Can I have a

15     little bit more minutes with my 20 minutes?

16           THE COURT:  If I stop you and ask you questions,

17     you'll get extra time for that.

18           DR. YIN:  Okay.  Thank you.  Then I'm going to

19     counter argument for what they said the program training

20     minister.  And CIU is an accredited institution, it was

21     registered with the Department of Education as a nonprofit or

22     not-for-profit institution, not a proprietary.  But, according

23     to their lawyer, in one of the court papers they filed, they

24     also claim CIU is a proprietary interest.  I will leave that

25     for the judge and for the judgment of the legal nature of the

1    institution.

2        And CIU also claims it's an institution that has Christian

3    faith.  And when we talk about the program, the program I was

4    teaching, they claim that I was an excellent educator, but

5    when I file, and as they laid me off, it's not because of the

6    budget cut, but when I file my complaint, and it was the South

7    Carolina Human Affairs Commission and also EEOC, they claimed

8    that I was the least productive faculty member by

9    fabricating -- by fabricating a faculty productivity

10   measurement that I had never seen.  And it never actually

11   existed.  They argued I was the least productive faculty

12   member, which has become a performance issue.  Just now Mr.

13   Blomberg said it's not the performance issue.  And this was

14   documented with the EEOC record.

15       And also, the program is not to train the ministers.  And

16   according to CIU's registration with the staff accreditation

17   agency and their report to the inventory programs with the

18   Commission on Higher Education, and that teaching English as a

19   second language, also including -- I'm sorry -- at the end,

20   teaching English as a foreign language registered under the

21   classified instructional classic code as the -- as -- the

22   number is 131401.  And this number matches the code for the

23   National Center for the Classified Instructional Programs.

24       And the program's purpose is to -- focuses on the

25   principles and the principles -- the principles and the

1    practices of teaching English to students who are not

2    proficient in English and who do not speak, read or write

3    English, and that that may prepare individuals to function as

4    teachers and administrators in such programs.  They reported

5    the program under this CIP code, clearly identified the

6    purpose of this whole program is to train English language

7    teachers.  Your Honor, I have my former students sitting here

8    in the audience, and they are the English language teachers,

9    they taught at the EPI with University of South -- USC.

10        And another thing I would like to bring up is the argument

11   is that consistently talking about this religious institution,

12   applying the previous courses, and then to roundly affirm me

13   as a minister.  Specifically they use the case of the

14   Hosanna-Tabor.  And in this case the nature of the case is

15   different.  And in this case the Supreme Court has set several

16   clear guidelines.  Number one, the school is constituted as a

17   church.  But CIU is not constituted as a church, as clearly

18   defined in this guide book is the Educational Philosophy and

19   Responsibility Guide.  And the 2008 for faculty and

20   administrators.  And it's not constituted as a church.  The

21   language can be located in this very guide, 180-page-long

22   guide.

23             THE COURT:  Can you tell me, Dr. Yin, if that is a

24   document that's in this record, it probably has a heading at

25   the top that gives you an ECF number that will tell me where

 1   it is in the court record.  It's probably at the very top of

 2   every page.

 3           DR. YIN:  Yes, I will.  This is actually they gave me

 4   during the discovery process.

 5           THE COURT:  Okay.  Is it part of the record --

 6           DR. YIN:  It's part of the record.

 7           THE COURT:  -- with regard to these motions, someone

 8   has filed this as an attachment?  Can you just tell me that

 9   ECF number at the top.

10           DR. YIN:  I will.  I will tell you --

11           THE COURT:  I think Mr. Blomberg is going to try to

12   show where you that is, and that will help me find it later

13   after this hearing.

14           MR. BLOMBERG:  159-5.

15           THE COURT:  Thank you.  159-5.

16           DR. YIN:  There are so many pages.  So it's page 92.

17   Page 92.  And number two, page 92, said, "While CIU is not

18   constituted as a church."  And then in the faculty

19   responsibility, clearly it is stated it is primarily a

20   teaching institution.  So there is a major differences in the

21   nature of this two -- the settings of the two cases.

22       And the second one is the teacher in the Hosanna-Tabor

23   case, she took eight courses in theology.  I didn't take eight

24   courses.  What they kept arguing is my experiences that I

25   attended Oral Roberts University.  I got my master's degree in

1    teaching English as a second language from the Oral Roberts
2    University.  There are 36 credit hours in that program.  And
3    the 32 hours, they're all in education.  Two hours is for the
4    physical and for the PE.  Two hours, that less than two credit
5    hours for the Holy Spirit in the Now.  And that is a class to
6    teach about praying tongue.  Praying tongue is not a position
7    that is CIU supported.  They kept arguing, using that as a
8    religious training that I had.

9        When I was at the interview, one of the top administrators
10   asking me, do you pray in tongue?  So I said, yes, I do, in
11   private.  And it end up the administrator told me, I would
12   like you to know that a former faculty member promoting
13   praying tongue, he was fired.

14       And also, another argument about that case is did the
15   teacher pass the oral examination by a faculty committee.  In
16   Hosanna-Tabor case, yes, the teacher passed the oral
17   examination.  But for me, I never knew an examination existing
18   in my whole life.

19       And another one is did the teacher obtain the endorsement
20   of the local synod district.  Yes.  In that case.  But not in
21   my case.  And CIU is governed by its accreditation agency.
22   And it's a secular agency located in Georgia.  And this
23   accreditation agency does not offer any endorsement to
24   university faculty members, but they do have the faculty
25   credential requirement.

1    And also, the teacher was commissioned as a minister in

2    that case, but I was never commissioned in this case.  Before

3    I was hired, during -- during my employment, and even after I

4    was hired, and nobody ever communicated that the employee

5    needs to perform the ministry role.

6    And before I was hired, I received this letter.  It's a

7    recruitment letter from Dr. Uecker, the former dean of the

8    graduate school.  This letter Dr. Uecker wrote.  Dr. Uecker

9    wrote, "I am so pleased that you are interested in applying

10    for faculty position at Columbia International University."

11    And, "...based on your background and passion, to make this

12    position one that is not TEFL or teacher education only, but

13    rather an appointment to teach in both programs as needed.  It

14    is my feeling that should you fill this position, and once we

15    have the funding to add yet another faculty member, that we

16    would move you fully into education and hire another TEFL

17    adult focused person for the TEFL program."

18    So when they hired me, they used my background for K to 12

19    teaching experiences.  So the first class I taught was

20    teaching English, the principal strategies for teaching K

21    through 12 English language learners, and it is a course that

22    I developed.

23    And in this very package, Dr. Uecker did not hire me

24    because of my ministry background, and he hired me because of

25    my educational background, my credential and my professional

1    experiences.  Here is a whole package, Your Honor.  I could

2    give you a copy of this package, and including the courses

3    created by passing down to me in the very program.

4        And another thing in this case I would point out is the

5    teacher in the Hosanna-Tabor case, she claimed that minister

6    tax exemption tax.  I never knew of that kind of thing

7    existing; now I know it.  I never claimed that tax exemption.

8        And another thing, Your Honor, I would like to point is

9    let's talk about document.  When a Judge Childs ordered that

10   both parties enter into the limited discovery process, and it

11   would begin to exchange documents, CIU did not ask me to

12   produce any documents to support their claim.  And because

13   under their claim it's just for the convenienceness of the

14   case, and they argue that I was a minister.  And instead, they

15   give me a jump drive -- where's my jump drive -- they gave me

16   a jump drive that contained 5339 page numbered documents.  It

17   took me hours to download it from the documents.  And they

18   gave me all these document dump in this way, and I couldn't

19   even carry it.  However, they proved helpful to me, because I

20   discovered the Faculty Guide, Educational Responsibilities

21   and -- Educational Philosophy and Responsibility Guide.  In

22   this very guide there is a policy about women in ministry.

23   It's the entry number 159.

24            THE COURT:  Thank you.

25            DR. YIN:  And the first -- and the policy is, "In

1  deference to those among us who hold that it is biblically

2  wrong for women to teach men in spiritual matters, women are

3  not assigned to teach required courses in Bible or theology."

4      And CIU admits both male and female students, and I teach

5  both male and females.  All the courses I was assigned to

6  teach are all the EDU courses and LNG courses.  And these are

7  all in all these documents dump.  (Inaudible.)  And my course

8  is located in the disciplinary field in education.  And in

9  that alone, I'm a woman.  So according to this policy, it's

10  biblically wrong for a woman to teach men in spiritual matter.

11  How can it be possible for me to be a minister?

12      And second, in this very policy, graduate faculty

13  credentials, faculty member's credential has been specified.

14  The policy said, "Resident, adjunct and visiting faculties are

15  expected to hold a Ph.D., Th.D., Ed.D. or similar degree in

16  their disciplinary field from an accredited institution."

17      I do not hold any degrees in Bible, in theology, in

18  ministry, in divinity.  My degree is in college education and

19  curriculum and instruction.

20      So according to this policy, I do not meet two

21  requirements in order to function as a minister at CIU.

22  Number one, I must be a man, and number two, I must have met

23  all the requirements for the faculty credential.  And I failed

24  to meet both standards.  I'm a woman.  I do not have that

25  degree.

1   And third, in this very same guide, Your Honor, I would
2   like to point out only six times of the word ministers are
3   located.  And the only one time has been used as a noun, which
4   is located in the policy related to the seminary -- to the
5   school of seminary and mission.  The policy about training
6   Christian ministers.

7   So according to its own definition, Christian ministers
8   need to be trained.

9   So claiming me, I have no Bible degree, no theology
10  background, no divinity degree, no ministry skills, it's just
11  like they are telling the whole world, and if I could be a
12  minister, the seminary needs to be closed down.  Ministers do
13  not need to be trained.

14  So the rest, the five times, we met five times, I used the
15  adverbs.  And none of the five times used in the situation and
16  the regarding the function of a minister.  And nowhere in this
17  handbook, nowhere in this handbook referring, and the faculty
18  members serving as the ministers or functioning as a minister,
19  nor the word is a minister gospel has ever been located in
20  this whole handbook.  And they also have the whole faculty
21  search recruitment procedure attached.

22  So next I would say that they are using the First
23  Amendment to talking about religious liberty.  Your Honor,
24  practicing my belief on a Christian campus is my religious
25  liberty.  I do pray, I did pray before the class.  I asked God

1    to give my students wisdom, to give myself wisdom to teach and

2    to learn the content.  And like all the other sessions run by

3    the politicians, even down the street at the Hill, the State

4    building, when they discuss a bill, before that, they pray.

5    They pray.  And I never led any religious -- and I never led

6    any religious services as they claimed.  And it is a total

7    lie.  And because CIU has created guidelines, and if you look

8    at the website you can find the chapel schedule.  They laid

9    out who will speak, and in a pod service over, the pod cast

10   and the listening recording over there.

11       So I was not a minister.  And my job -- and my job is to

12   train the students to be teaching English.  And for the book,

13   they talk about a Christian theology, probably some of my

14   students read that book.  It's not about theology, it's about

15   the professionalism of being an English language teacher.

16   You, as a Christian.  Because the author observed there are a

17   lot of English language teachers out there overseas using the

18   white privilege.  And then they just say I'm a native English

19   speakers, but without any professionalism.

20       So that book just explains being a Christian, we got to be

21   a good ambassador of Christ through our professionalism of

22   teaching English effectively and being a good testament

23   through our profession.  It's like, Your Honor, I would like

24   you to see when you walk around, drive around the Columbia,

25   you're going to see all these billboard everywhere in

1    Columbia, CIU is recruiting students for the business major.

2    Business leadership major.  Even at the airport we just came

3    out of, it's business leadership major.  It's not theology

4    major.

5         So in this case, and is CIU conflating the case to confuse

6    it.  And they become patronize all the meanings, all the

7    words.  And, for example, they use the program evaluation.

8    The program evaluation is a general university serving of

9    students' overall experiences of the program, of the many

10    experiences during the -- during the program time.  And they

11    used that as the argument.

12        And the one fact I would like you to point to the judge to

13    see is that in this document -- and yes, they said

14    evangelism -- but for the whole program, I only taught four

15    courses.  And also, in the same document and the one item they

16    did in the report is talking about ministry skills.  And in

17    that -- on that survey, ministry skills has been marked as not

18    applicable.  Not applicable for that program.

19        So it's the same document -- let me find out -- is my

20    Exhibit 34, I believe.  I do not know the entry number.  Is my

21    Exhibit 33.  Here, ministry skills not applicable.

22             THE COURT:  And you're referring to your affidavit at

23    paragraph 33?

24             DR. YIN:  Yes, it's my responses in opposition to

25    their summary judgment.

1          THE COURT:  Okay.

2          DR. YIN:  Is this one.

3          THE COURT:  At page 33 of your opposition memorandum?

4          DR. YIN:  Yeah, yeah, yeah.  Thank you.  Sorry,

5   I'm -- So as for the leadership, they said they hire me as a

6   leader, the director of the TESOL program.  Your Honor, this

7   is a fact.  And the CIU runs the program is the one-man band.

8   As the former CIU employees sitting out here, they can

9   testify, if you need, but I know it's not for that.

10         THE COURT:  Not today.

11         DR. YIN:  Yes, not for today.  And then it's for

12  one-man band, that because there's only one full-time

13  professor in that program, so you are the director.  All the

14  professors are cross-teaching each other's programs.

15     So in the faculty evaluation they talk about -- it's in my

16  Exhibit 46 -- 46 or 42 is my own exhibit.  And it talking

17  about like leadership skill and that they mark it not

18  applicable.

19     They said they hired me as a leader, but they never

20  evaluated me as a leader.  They hired me as a minister, but

21  they never evaluated me as a minister.  And I never knew such

22  things existed.

23     Another thing I want to make clear, Your Honor, is CIU's

24  policy.  CIU has the policy to acknowledge.  CIU doesn't have

25  the policy to acknowledge the employees are functioning as a

1    minister on behalf of a church.  The requirement is that he

2    must be an ordained minister, employed by a church as the

3    first assignment.  His church must have agreement with CIU

4    that he's sent by his church to further the church mission at

5    CIU.

6        The reason I use "he" is because CIU never acknowledge --

7    never acknowledging women to be able to function as a

8    minister, they only acknowledge men.  CIU has been withholding

9    this document for two years.  This very document that

10   demonstrating this policy.  Although they do acknowledge that

11   exists.  Because CIU is not a church, but a teaching

12   institution.  CIU itself can not appoint any employees to be

13   ministers, can not ordain any employees to be the minister.

14            THE COURT:  Let me stop you there and ask you, Dr.

15   Yin.  Because under Hosanna-Tabor, doesn't that case stand for

16   the principle that the ministerial exception that is what

17   we're talking about today, is broader than the, I guess,

18   formal definition and understanding of what a church minister

19   or formally ordained minister would be?

20            DR. YIN:  Yes.  Yes.  Yes.  And but if they argue

21   they have ministers, they do, but they have to be the church

22   appointment.  They have the church appointment.

23            THE COURT:  So you do not acknowledge that the

24   ministerial exception can apply to employees who are not

25   formal ordained ministers?

1              DR. YIN:  No, I'm not implying that.  I'm not

2      implying that.  Because they -- Do they have any ministers?

3      They do, because they are men.  But they hold the ministers'

4      position outside the campus.  They further the church mission.

5      So they are sent by the church to CIU to do the mission.

6          Like one of the testimonies enrolled by a former CIU

7      seminary student, and he testified, and it's in the pile of

8      my -- in a pile of the exhibits I gave to the Court.  And she

9      said -- he said here, "Having been a seminary student at CIU

10     from 2007 graduating in 2011, I am aware of CIU's conservative

11     biblical view not allowing women to teach Bible or theology.

12     Further, it's my understanding there are no women who are

13     employed at CIU who are otherwise pastoring a church or hold a

14     position over men.  I'm aware of other men who are pastoring

15     while holding a faculty position at CIU."

16          So if we're back to this case, Hosanna-Tabor case, and

17     talking about now ordained minister, and it is now ordained

18     minister, I do not meet any of those requirements the Supreme

19     Court has set.  And I do not have any training, I do not claim

20     that tax exemption, because I didn't even know such thing

21     existing.  I was not a minister.  I do not pass any of the

22     oral examination.  And the university is not constituted as a

23     church.  But according to the argument, the whole reason they

24     apply the ministry, the whole reason they apply this ministry

25     application to this case, it is because they argued the

1    lawsuit was barred by ministerial exception, which is the

2    First Amendment doctrine that precludes claims brought by

3    ministers of a church.

4        So CIU is not -- is not a church.  And if CIU also

5    receives federal funding Title IV.  And as they said, they do

6    not want the government to enter into -- entangle the CIU's

7    affairs, but they do receive the federal funding.  And their

8    information also registered with the Federal Government Title

9    II.

10       And if they really do not want the Government to

11   interfere, that information should not be located in any of

12   the U.S. departmental websites.

13            THE COURT:  All right.  Thank you, Dr. Yin.

14            DR. YIN:  Thank you very much.

15            THE COURT:  Let me ask you, if you can kind of

16   recapitulate for me, I want to see if I can get you to focus

17   on maybe the five most important documents, and you've talked

18   a lot about them, but I want to try to identify where those

19   are in the record.

20            DR. YIN:  Yeah, yeah.

21            THE COURT:  Because Mr. Blomberg did the same thing

22   in his presentation and directed the Court to the documents

23   that he thinks support his position.  So I'd like you to see

24   if you can list the best five that support your position for

25   me.  I'll try to help you a little bit, to save some time, I

1    know you talked about your evaluations?

2            DR. YIN:  Yes.

3            THE COURT:  Your faculty evaluations?

4            DR. YIN:  Yeah.

5            THE COURT:  Can you maybe tell me where those are in

6    the record?

7            DR. YIN:  It's my limited discovery Exhibit 46.  It's

8    my -- in opposition to the defendant's summary judgment.  And

9    in this exhibits I think it just now I forgot to cover it, and

10   it's clearly laid out on page four, it's general performance

11   and corporate culture factors.  For the section of general

12   performance part, CIU evaluated my academic work performance.

13           THE COURT:  Okay.

14           DR. YIN:  And then the corporate cultural factors,

15   and they evaluate the Christian lifestyle part, such as

16   agreement with CIU values.  So this document clearly proves

17   that I was a teaching faculty, a teaching faculty who is a

18   practicing Christian, and it is -- that is required.  So this

19   is the evaluation.

20       And also, I have the recruitment letter.

21           THE COURT:  Okay.  That will be the second one.

22           DR. YIN:  Yes.  The second one, the recruitment

23   letter is in the docket record number four.

24           THE COURT:  And that's the letter from Dr. Uecker

25   that you were referencing before, correct?

1          DR. YIN:  Yes, before I was -- before I was -- before

2   I was hired.  And the original envelope is here dated

3   March 5th, 2008.

4          THE COURT:  All right.  And then I know you also

5   talked a lot about and held up the handbook.

6          DR. YIN:  Yes.  This one, you can have this one.

7          THE COURT:  I know it's in the record somewhere, I'm

8   just trying to make sure I know where to go and find it,

9   because there are a lot of documents in this record, so I'm

10  just trying to get you to help me identify the most importance

11  ones.

12         DR. YIN:  Okay.

13         THE COURT:  And I think we already figured out the

14  ECF number on that one, so I have that on my list.

15         DR. YIN:  Yes, thank you, um-hum.

16         THE COURT:  And so I have the faculty evaluations,

17  recruitment letter, the handbook, and tell me two more of the

18  documents you think are the most important that support your

19  position.

20         DR. YIN:  Okay.  It is the CIU's CIP code.  The

21  program's CIP code.  C-I-P code.

22         THE COURT:  Oh, okay.

23         DR. YIN:  The CIP code is the --

24         THE COURT:  This is the program code that CIU used

25  to --

1           DR. YIN:  Report.

2           THE COURT:  -- the Commission on Higher Education

3    about the course that you were teaching.

4           DR. YIN:  Yes, about the program I'm serving.  And

5    also, it is the same program, and for any academic institution

6    accredit, if they want to get a program approval from the

7    accreditation agency, they have to use this CIP code, it's

8    called a classified instructional programs, and it's uniformed

9    across the country in America.

10           THE COURT:  All right.  Any other documents?

11           DR. YIN:  It's here, I know it's here, it's limited

12    discovery Exhibit No. 11.  The CIP code is 131401.

13           THE COURT:  All right.

14           DR. YIN:  And I have to lean, because the website

15    over there.  And if, Your Honor, you are interested in that,

16    you can also Google, you can also type in this number, 39 --

17           THE COURT:  Well, I'm not allowed to go and look

18    outside what's in the record to make a decision on the motion.

19    I have to confine myself to what's already in the record.

20           DR. YIN:  Okay.  So another argument, I put it here,

21    is the CIP code of 39, that's for all the theology, for the

22    Bible, for the biblical study, is totally two different

23    fields.

24           THE COURT:  Any other documents that you want to make

25    sure that I consider when I am weighing your argument?

1          DR. YIN:  Okay.  And another document is the

2    Department of Education registration, and it is Exhibit 2.

3    Limited discovery Exhibit 2.

4          THE COURT:  Okay.

5          DR. YIN:  And this one identifies CIU's nature of

6    school is nonprofit, but CIU's lawyer also said CIU has

7    proprietary interests.  So as a school, you can not be both,

8    either nonprofit or proprietary.  And that is -- it's in the

9    system.

10         THE COURT:  I can find it.

11         DR. YIN:  You can find it?  No, I just want to direct

12   you so you don't spend time.  It's this one is the entry

13   number 68.

14         THE COURT:  Thank you.

15         DR. YIN:  Page two.

16         THE COURT:  Thank you very much, Dr. Yin.

17         DR. YIN:  Can I have one more story?  Sorry, Your

18   Honor, can I have one more document?

19         THE COURT:  One more document.  Okay.

20         DR. YIN:  One more document is College of Education

21   Assessment Plan.  And for the TEFL program.  And it is

22   learning outcome of the students.  You will see that it has

23   nothing to do with the spiritual matter.  That is -- it's 9,

24   it is limited Exhibit 9.  And this is also a document that

25   they released, the college education.

1          THE COURT:  Okay.  Thank you very much, Dr. Yin, and

2     also to defense counsel, it's been very helpful.  I will take

3     everything and consider it very carefully and issue a report

4     and recommendation, all the cross-motions for summary

5     judgment, just as soon as possible.

6        Thank you all very much.  I hope y'all have a great rest

7     of your day.

8          DR. YIN:  Thank you so much, Your Honor.

9

10        (Court adjourned at 10:59 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATION

2

3          I, Debra L. Potocki, RMR, RDR, CRR, Official Court

4    Reporter for the United States District Court for the District

5    of South Carolina, hereby certify that the foregoing is a true

6    and correct transcript of the stenographically recorded above

7    proceedings.

8

9

10

     S/Debra L. Potocki
11   _____

12   Debra L. Potocki, RMR, RDR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25