**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| Lishu Yin, | ) | |
| | ) | Civil Action No.: 3:15-cv-03656-JMC |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| | ) | |
| Columbia International University, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court for review of the Magistrate Judge's Report and Recommendation ("Report") filed on July 23, 2018 (ECF No. 197). The Report addresses Plaintiff Lishu Yin's ("Yin") Motion for Summary Judgment (ECF No. 144) and Defendant Columbia International University's ("CIU") Motion for Summary Judgment (ECF No. 159). The Report recommends that the court deny Yin's Motion, but grant CIU's Motion, because Yin's suit against CIU is barred by the ministerial exception to employment discrimination statutes. (ECF No. 197 at 2, 15.) For the reasons stated herein, the court **ACCEPTS IN PART** the Report, **DENIES** Yin's Motion for Summary Judgment, and **GRANTS** CIU's Motion for Summary Judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

**1.  <u>Factual History</u>**

CIU is located in Columbia, South Carolina, and offers undergraduate, graduate, post-graduate, and advanced programs. (ECF No. 160-1 at 1, 5.)  Founded in 1923, CIU is a "multi-denominational Christian institution of higher education dedicated to preparing world Christians to serve God with excellence." (*Id.* at 5.) In addition to being a nonprofit, educational institution (ECF No. 144-1 at 2), CIU identifies as a ministry. (ECF No. 159-2 at 4; ECF No. 159-3 at 11;

1

ECF No. 160 at 5.) CIU trains "Christians for global missions, full-time vocational Christian ministry in a variety of strategic professions, and marketplace ministry." (ECF No. 160-1 at 5.) CIU's first class was only seven students, but the institution now includes over 1,200 students. (*Id.*) The purpose of CIU is to educate people "from a biblical worldview to impact the nations with the message of Christ." (*Id.*) In order to achieve this purpose, all of CIU's programs "emphasize spiritual development, biblical training, and ministry skills development." (*Id.*) CIU's motto is: "To know Him and to make Him known." (*Id.*)

CIU requires all employees, including faculty, "to live, teach, and promote a life of godly choices and Christian growth . . . ." (ECF No. 159-3 at 11.) The faculty at CIU are "all part of the effort to prepare Christians for service in ministries that support the establishment of healthy, reproducing churches at home and abroad." (*Id.*) While teaching at CIU, faculty members are required to "accept the faculty role as a ministry in the biblical sense and should never consider it a 'mere job.'" (ECF No. 159-5 at 40.) A faculty member at CIU is freely committed to CIU's Statement of Faith, Employee Handbook, and Educational Philosophy & Responsibilities Guide. (*Id.* at 45.) For example, CIU's Educational Philosophy & Responsibilities Guide ("Educational Guide") says the following:

> Since the teacher has been called to CIU by God, there should be a full-time commitment to this ministry. Though some regulation to meet other priorities is appropriate, the faculty role is not compatible with a "40-hour week" mentality. On the other hand, one should not over extend by assuming responsibility not of God's plan.

(*Id.* at 40.) According to CIU, such a commitment is an expression, and not an abridgment, on academic freedom. (*Id.* at 45.) In the classroom, faculty members are expected to express and model CIU's beliefs and minister to students about the Gospel. (ECF No. 159-2 at 8.) For example, the Educational Guide also states:

In pursuing educational objectives, the teacher is involved in a discipling ministry. Although much of the faculty member's time is scheduled around the classroom, impact on students involves a variety of contacts and relationships. In addition, in teamwork with other faculty and staff members the teacher models and communicates the life of the body of Christ. Designed to implement this concept, specific responsibilities noted constitute the teacher's integrated ministry. . . . Attendance at all united and school chapels, as well as at all scheduled Prayer Day activities, is a community responsibility. Occasionally, faculty members also may be requested to participate in chapel programs or in other Ministry events.

(*Id.* at 168.) Additionally, faculty members at CIU are required to sign Affirmation Statements, which assign numerous religious tasks for faculty to complete. (ECF No. 151-10.) Lastly, CIU regularly evaluates faculty in regard to their adherence to CIU's mission, Doctrinal Statement, Core Values, Lifestyle Policies, and Philosophy of Human Resources (ECF No. 151 at 3-7). (*Id.*)

CIU considers a job applicant's Christian life, training, and calling as a condition of employment. (ECF No. 159-2 at 9; ECF No. 162-11 at 5-6.) On July 1, 2008, CIU advertised the faculty position of TEFL-ESL,[1] which was described as "facilitating student growth in biblical knowledge, spiritual maturity, ministry orientation, and the professional skills necessary for service in a variety of cultural contexts." (ECF No. 162-16 at 1.) The TEFL-ESL instructor was "called upon to embody and to implement CIU's purpose and mission . . . ." (*Id.*) On March 10, 2008, Yin submitted an application for this position and provided the name of her church, pastor, and personal testimony regarding Christianity. (ECF No. 151-5 at 6; ECF No. 159-2 at 9.) According to CIU officials, Yin's representations were "important, if not essential," in the decision to hire her. (ECF No. 159-2 at 10.) Moreover, CIU officials state that Yin's education from Oral Roberts University, a Christian college, encouraged them to hire her because it showed that she

---

[1] Teaching English as a Foreign Language ("TEFL") focuses on teaching English overseas, while Teaching English to Speakers of Other Languages ("TESOL") concerns teaching English to domestic audiences. (ECF No. 162-11 at 6.) According to CIU, both subjects concern teaching English as a Second Language ("ESL"). (*Id.*)

had a "Christian education orientation" and had "received Christian training." (ECF No. 162-11 at 9.) On May 19, 2008, Yin received a formal confirmation of her appointment to CIU. (ECF No. 151-7 at 1.)

Yin was employed as a full-time faculty member at CIU from July 1, 2008, to June 30, 2014. (ECF No. 1 at 4.) While at CIU, Yin taught courses in TEFL, and in 2011, she became the Director of the TESOL Program in 2011. (*Id.* at 8, 10.) Yin holds three degrees: (1) a doctorate degree from Mississippi State University; (2) a master's degree from Oral Roberts University; and (3) a bachelor's degree from Guizhou University. (ECF No. 1-2 at 1.)

As part of Yin's academic responsibilities at CIU, she taught an array of courses, including but not limited to, TEFL and TESOL. (ECF Nos. 162-3, 162-4, 162-5, 162-6, 162-7, 162-8.) Each course had a distinct objective, but some of the objectives included: (1) "explor[ing] strategies for teaching multicultural and multilingual ESOL learners in K-12 settings; (2) "develop[ing][] . . . personal qualities necessary for [an] effective English language teaching ministry; (3) "discuss[ing] the implications of second language acquisition theories to the language classroom; (4) "present[ing] a rationale for using English language teaching as ministry"; and (5) "develop[ing][] . . . excellence in personal academic standards." (ECF No. 162-3 at 1; No. 162-6 at 3; ECF No. 162-8 at 1.) In addition to teaching her courses, Yin was also responsible for "supervising practicum and internships," "preparing course syllabi," and "helping students explore career and life goals." (ECF No. 151-8 at 1.) She was expected to participate in various institutional activities, including chapel and prayer-day programs, annual faculty workshops, and other faculty meetings. (*Id.* at 2.) As a faculty member, Yin was tasked with helping CIU to prepare students for ministry roles. (ECF No. 162-11 at 12.)

During the course of her tenure at CIU, Yin required her students to pray together over the course of the semester, integrated biblical materials into her courses, and prepared students for ministry roles. (ECF No. 152 at 10-11; ECF No. 159-2 at 15; ECF No. 162-11 at 11-12.) Yin was also spiritually active outside of her classroom, but still within the CIU community. (ECF No. 162-11 at 10-12; ECF No. 152 at 15.) For instance, Yin led the Advisor/Advisee Chapels at CIU and determined the content of those meetings. (ECF No. 162-11 at 11.) In that role, Yin facilitated forty-five minute meetings in which participants engaged in prayer, worship, and religious teaching. (ECF No. 152 at 15.)

As a member of the CIU faculty, Yin was evaluated by her superiors. (ECF No. 159-2 at 14-15.) In 2009, she received a satisfactory rating and was "well-rated" by her students. (ECF No. 162-11 at 12.) In 2012, she was given an overall rating between exceptional and commendable. (ECF No. 151-11 at 4-5.) Her 2012 evaluation stated the following:

> Lishu Yin not only has a great passion for the area of TESOL, but also desires to bring all education students to a level of excellence. . . . She is a spiritually minded educator who is learning more about framing her teaching with biblical integration. Dr. Yin continues to see God's providential hand at work. She is a great asset spiritually and academically to the College of Education.

(*Id.* at 4.) Yin also performed a self-evaluation form in 2012. (ECF No. 151-12 at 1.) As a practitioner, she stated that she provided guidelines for every assignment, met with students individually, and incorporated technology into her teaching. (*Id.* at 2.) As an authentic professional, she opined that she incorporated CIU's institutional goals into every class, encouraged students to "follow the Lord's calling and live out the faith," and required her students to form prayer groups. (*Id.* at 3-4.)

In January 2014, CIU faced financial difficulties. (ECF No. 152 at 17.) As a result of those difficulties and not because of how Yin taught her classes, CIU decided to terminate Yin's contract.

(*Id.* at 17.) Subsequently, on May 18, 2015, and at the request of Yin, the South Carolina Human Affairs Commission was unable to conclude a violation under state law. (ECF No. 1-1 at 1-3.) On June 26, 2015, the Equal Employment Opportunity Commission adopted the findings of the South Carolina Human Affairs Commissioner and issued a Notice of Right to Sue to Yin, allowing her ninety days (90) to file a suit against CUI in federal court. (ECF No. 1-1 at 4-5.)

## 2. <u>Procedural History</u>

Yin, proceeding *pro se*, filed her Complaint in this court on September 11, 2015. (ECF No. 1.) Yin alleges that CIU violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2(a), 2000e-3(a), by discriminating and retaliating against her on the basis of race, sex, and national origin. (*Id.* at 4, 36.) Additionally, Yin maintains that CIU violated the Equal Pay Act of 1963, 29 U.S.C. 206(d), and committed defamation under state law. (*Id.* at 36.)

On November 9, 2015, CIU filed a Motion to Dismiss for Failure to State a Claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and/or to Strike pursuant to Federal Rule of Civil Procedure 12(f). (ECF No. 20.) On April 11, 2016, the Magistrate Judge issued a Report granting CIU's Motion to Dismiss Yin's defamation claim and denying CIU's Motion to Dismiss Yin's federal claims and its Motion to Strike Yin's allegedly untimely allegations. (ECF No. 40.) On September 26, 2016, after proper objections were filed by Yin and CIU to the Magistrate Judge's Report (ECF Nos. 43, 44), this court entered an order adopting the Magistrate Judge's Report. (ECF No. 66.)

On October 24, 2016, CIU filed its Motion for Certification of an Issue for Interlocutory Appeal under 28 U.S.C. § 1292(b) or, in the Alternative, Motion to Reconsider under Federal Rule of Civil Procedure 59(e), stating that Yin was a minister, barring her federal claims under the ministerial exception. (ECF No. 71.) On November 10, 2016, Yin filed a Response in Opposition

to CIU's Motion for Certification of an Issue for Interlocutory Appeal or, in the Alternative, Motion to Reconsider, denying, among other things, that she is a "minister," thus limiting the applicability of the ministerial exception. (ECF No. 84.) CIU replied to Yin's response in opposition, reaffirming the facts and law that were present in its original Motion (ECF Nos. 71, 71-1). (ECF No. 95.) On July 20 and July 28, 2017, CIU filed Supplemental Authorities in Support of its Motion for Reconsideration. (ECF Nos. 110, 114.) On July 25 and August 1, 2017, Yin filed Memoranda in Opposition. (ECF Nos. 111, 115.) On September 28, 2017, the court denied CIU's Motion for Certification of an Issue for Interlocutory Appeal and denied CIU's Motion to Reconsider under Federal Rule of Civil Procedure 59(e). (ECF No. 66.)

After additional discovery pursuant to a scheduling order (ECF No. 126), Yin filed her Motion for Summary Judgment on February 28, 2018, and argued that she was not a minister for purposes of the ministerial exception. (ECF No. 144.) CIU filed its Motion for Summary Judgment on March 27, 2018, and maintained that Yin was a minister for purposes of the ministerial exception. (ECF No. 159.) The Magistrate Judge issued a Report on July 23, 2018. (ECF No. 197.) On the basis of the ministerial exception, the Report recommends dismissing Yin's Motion and granting CIU's Motion. (*Id.* at 16.) Yin filed her Objection to the Report on August 20, 2018, arguing that the ministerial exception does not apply to her case.[2] (ECF No. 207.) CIU replied in

---

[2] In her Objection, Yin included additional exhibits that were not before the Magistrate Judge. (*See* ECF No. 207-2; ECF No. 207-5; ECF No. 207-3 at 2-7; ECF No. 207-4 at 4-13, 15-27, 30-31.) In the instant case, the court need not consider these documents because they were not before the Magistrate Judge. *See Allen v. BMW Mfg. Co., LLC*, 260 F. App'x 263, 264 (4th Cir. 2008) (holding that a district court did not abuse its discretion when it declined to grant a motion to strike and declined to hear additional evidence from a *pro se* plaintiff during summary judgment); *Foster v. BNP Residential Props. Ltd. P'ship*, No. 2:06–cv–2440-PMD-RSC, 2008 WL 512788, at *7-8 (D.S.C. Feb. 25, 2008) (declining to consider additional evidence that was not before a magistrate judge for purposes of summary judgment); *Tyson v. Ozmint*, No. 6:06–0385–PMD-WMC (D.S.C. Oct. 31, 2006) ("However, this court is not required to consider any evidence that was not before the magistrate judge.").

opposition to Yin's Objection on September 25, 2018. (ECF No. 220.) CIU contends that the ministerial exception bars Yin's suit and that the court should dismiss the case with prejudice. (ECF No. 159-1 at 35.)

## II. STANDARD OF REVIEW

The Magistrate Judge's Report is made in accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02 for the District of South Carolina. The Magistrate Judge only makes a recommendation to this court, and the recommendation has no presumptive weight. *See Mathews v. Weber*, 423 U.S. 261, 270-71 (1976). The responsibility to make a final determination remains with the court. *Id.* at 271. As such, the court is charged with making *de novo* determinations of those portions of the Report to which specific objections are made. *See* 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3). Thus, the court may accept, reject, or modify, in whole or in part, the Magistrate Judge's recommendation or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

A federal court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). In a summary judgment motion, "[a] court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)). Nevertheless, "the nonmoving party . . .

must offer some 'concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Williams v. Genex Servs., LLC*, 809 F.3d 103, 109 (4th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). Summary judgment is therefore appropriate "when the nonmoving party has the burden of proof on an essential element of her case and does not make, after adequate time for discovery, a showing sufficient to establish that element." *Id.* (citing *Celotex Corp.*, 477 U.S. at 322-23).

Furthermore, the court is required to interpret *pro se* documents liberally and will hold those documents to a less stringent standard than those drafted by attorneys. *See Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978); *see also Hardin v. United States*, C/A No. 7:12–cv–0118–GRA, 2012 WL 3945314, at *1 (D.S.C. Sept. 10, 2012). Additionally, *pro se* documents must be construed in a manner, "no matter how inartfully pleaded, to see whether they could provide a basis for relief." *Garrett v. Elko*, No. 95-7939, 1997 WL 457667, at *1 (4th Cir. Aug 12, 1997). Although *pro se* documents are liberally construed by federal courts, "[t]he 'special judicial solicitude' with which a district court should view *pro se* complaints does not transform the court into an advocate." *Weller v. Dep't of Soc. Servs. for Balt.*, 901 F.2d 387, 391 (4th Cir. 1990).

### III. DISCUSSION

The First Amendment to the United States Constitution provides in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. "Both Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 181 (2012). In *Hosanna-Tabor*, the United States Supreme Court agreed with the trend among federal courts and affirmed the existence of a "ministerial exception" grounded in the First Amendment. 565 U.S. at 188. The ministerial exception applies to

employment discrimination statutes[3] and bars suits challenging a religious group's decision to fire an employee. *Id.* at 195-96. In other words, the ministerial exception operates as an affirmative defense in employment discrimination lawsuits. *Id.* at 195 n.4. The ministerial exception has been applied to employment discrimination statutes such as the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), and Title VII of the Civil Rights Act of 1990 ("Title VII").[4] *See Grussott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655 (7th Cir. 2018) (applying the ministerial exception to the ADA); *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190 (2nd Cir. 2017) (applying the ministerial exception to Title VII); *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829 (6th Cir. 2015) (applying the ministerial exception to Title VII); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169 (5th Cir. 2012) (applying the ministerial exception to the ADEA and ADA); *E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795 (4th Cir. 2000) (applying the ministerial exception to Title VII); *Starkman v. Evans*, 198 F.3d 173 (5th Cir. 1999) (applying the ministerial exception to the ADA); *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985) (applying the ministerial exception to Title VII).

In *Hosanna-Tabor*, the petitioner, Cheryl Perich, was a "called" teacher with the Hosanna-Tabor Evangelical Lutheran Church and School. 565 U.S. at 176-78. Perich was fired after she was diagnosed with narcolepsy and brought suit against Hosanna-Tabor under the ADA. *Id.* In

---

[3] The Supreme Court did not "express [a] view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by religious employers." *Hosanna-Tabor*, 565 U.S. at 196.

[4] The United States Court of Appeals for the Fourth Circuit has not only used the ministerial exception in employment discrimination suits, but has also applied the ministerial exception to the Fair Labor Standards Act ("FLSA"), a statute regulating wages. *See Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299 (4th Cir. 2004) (applying the ministerial exception to the FLSA).

determining the existence of a ministerial exception to employment discrimination statutes, the Supreme Court explained:

> The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

*Id.* at 188-89. The Court ultimately concluded that Perich's claim was barred by the ministerial exception. *Id.* at 190. In concluding that the ministerial exception was applicable to Perich, the Court considered "the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church." *Id.* at 192. In its analysis, the Court emphasized that there is not "a rigid formula for deciding when an employee qualifies as a minister." *Id.* at 190. Indeed, the Court also considered that Hosanna-Tabor held Perich out as a minister, and Perich's title as a minister reflected a significant degree of religious training. *Id.* at 191-92. Rejecting an alternative view of the United States Court of Appeals for the Sixth Circuit, the Court identified that the lower court "gave too much weight to the fact that lay teachers at the school performed the same religious duties as Perich[]" and "placed too much emphasis on Perich's performance of secular duties." *Id.* at 193. Federal courts must remain mindful that "[t]he amount of time an employee spends on particular activities is relevant in assessing that employee's status, but that factor cannot be considered in isolation, without regard to the nature of the religious functions performed and other considerations . . . ." *Id.* at 194.

In order for the ministerial exception to apply, an employer must be a religious institution, and an employee must be a minster. *See Shaliehsabou*, 363 F.3d at 307-11. *See also Curl v.*

*Beltsville Adventist Sch.*, No. GJH-15-3133, 2016 WL 4382686, at *8 (D. Md. Aug. 15, 2016) ("For the ministerial exception to bar a claim, two factors must be present: the employer must be a religious institution, and the employee must have been a ministerial employee." (citations omitted)). For purposes of the ministerial exception, an entity is a religious institution when "that entity's mission is marked by clear or obvious religious characteristics." *Shaliehsabou*, 363 F.3d at 310. *Hosanna-Tabor* specifically declared that the ministerial exception is applicable to "the decision[s] of religious group[s]." 565 U.S. at 181.

In order to determine whether an employee is a minister under the ministerial exception, a federal court, at the very least, must consider: (1) an employee's formal title given to him or her by a religious group; (2) the substance reflected in the title; (3) an employee's use of the title; and (4) the functions performed by the employee for the religious institution. *See Hosanna-Tabor*, 565 U.S. at 192. In this analysis, a federal court must focus "on 'the function of the position' at issue and not on categorical notion of who is or is not a 'minister.'" *Roman Catholic Diocese*, 213 F.3d at 801 (citing *Rayburn*, 772 F.2d at 1168). Both before and after *Hosanna-Tabor*, it is apparent that the determination of whether one is a minister is a fact-specific inquiry under the circumstances. *See Fratello*, 863 F.3d at 206 ("In each case, therefore, we must assess the specific circumstances of employment."); *Cannata*, 700 F.3d at 176 ("However, *Hosanna–Tabor*'s rejection of a bright-line test likely reflects the diversity of religious practice in this country; given the pluralism of religious thought for which America is known and celebrated, it may not be possible to develop a one-size-fits-all approach to the ministerial exception."); *Richardson v. Nw. Christian Univ.*, 242 F. Supp. 3d 1132, 1145 (D. Or. 2017) ("The one unifying theme is that courts must carefully apply the *Hosanna–Tabor* factors to the specific facts of each case.").

After *Hosanna-Tabor*, federal district courts, depending upon the circumstances, have come to a range of conclusions in regard to whether an employee is a minister. *Compare Herzog v. St. Peter Lutheran Church*, 884 F. Supp. 2d 668, 674 (N.D. Ill. 2012) (concluding that a "called" teacher was a minister for purposes of the ministerial exception); *Biel v. St. James Sch.*, No. CV 15-04248 TJH (ASx), 2017 WL 5973293, at *2 (C.D. Cal. Jan. 24, 2017) (holding that a full-time fifth grade teacher was a minister under the ministerial exception because she administered weekly tests from a Catholic textbook, prayed with the students twice a day, and taught religion to students four times a week); *Curl*, 2016 WL 4382686, at *10 (finding that a music teacher at a Seventh-day Adventist institution qualified under the ministerial exception); *with Herx v. Diocese of Fort Wayne-S. Bend Inc.*, 48 F. Supp. 3d 1168, 1177 (N.D. Ind. 2014) (holding that a diocese failed to show that a junior high school teacher was a minister under *Hosanna-Tabor* because it would "greatly expand the scope of the ministerial exception"); *Morgan v. Cent. Baptist Church of Oak Ridge*, 2013 No. 3:11-CV-124-TAV-CCS, 2013 WL 12043468, at *20 (E.D. Tenn. Dec. 5, 2013) (concluding that the ministerial exception did not bar a secretary from pursuing a hostile work environment claim under Title VII when her duties were primarily clerical). On the other hand, federal appellate courts have generally applied the ministerial exception during circumstances in which an employee is clearly within the purview of *Hosanna-Tabor*. *See Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416, 426-29 (2d Cir. 2018) (holding that a hospital chaplain, pursuant to *Hosanna-Tabor*, qualified under the ministerial exception in an employment discrimination claim against the New York Methodist Hospital); *Grussgott*, 882 F.3d at 657-62 (concluding that the ministerial exception, under the *Hosanna-Tabor* factors, barred a Hebrew teacher's claim against a Jewish day school); *Fratello*, 863 F.3d at 206-10 (holding that a "lay principal" of a parochial school, after a fact intensive inquiry, was barred from pursuing an employment discrimination suit because

of the ministerial exception and *Hosanna-Tabor* factors and declining to presume all parochial school principals within the purview of the ministerial exception); *Cannata*, 700 F.3d at 177-80 (finding that the ministerial exception barred a former music director of a church from bringing employment discrimination claim after applying the *Hosanna-Tabor* factors).

The Fourth Circuit has yet to directly opine on the breadth and scope of *Hosanna-Tabor* and has only cited to it when discussing affirmative defenses and judicial restraint when resolving issues of religious doctrine. *See Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015) ("Viewed through this lens, the anti-duplication provision is more in the nature of an affirmative defense like the statute of limitations or the failure to exhaust administrative remedies, which are to be timely asserted by a defendant who chooses to do so." (citations omitted)); *Am. Humanist Ass'n v. Md.-Nat'l Capital Park & Planning Comm'n*, 891 F.3d 117, 119-20 (4th Cir. 2018) ("To that end, the Free Exercise Clause prohibits the government, and the judiciary in particular, from entertaining, much less resolving, questions that turn on issues of religious doctrine, practice, and belief." (citations omitted)). However, prior to *Hosanna-Tabor*, the Fourth Circuit held that the ministerial exception applied to a part-time music teacher and Director of Music Ministry at a Catholic cathedral because, among many other factors, she "played a prominent role in worship services," "helped to lead the congregation in song," and "was . . . a visible . . . leader of the congregation . . . ." *See Roman Catholic Diocese*, 213 F.3d at 803. Four years later, the Fourth Circuit, though using a different test than *Hosanna-Tabor*, also applied the ministerial exception to a kosher supervisor who oversaw the preparation of kosher food because of "the importance of dietary laws to the Jewish religion" and his duties involved religious worship and ritual. *See Shaliehsabou*, 363 F.3d at 309. Similarly, non-ordained associates in pastoral care qualify as ministers under the ministerial exception because they act as "a liaison between the

church as an institution and those whom it would touch with its message." *Rayburn*, 772 F.2d at 1168.

Since the aftermath of *Hosanna-Tabor*, legal commentators have considered and debated the expansive reach of the ministerial exception to various occupations, ranging from choir directors, school teachers, university professors, and public relations personnel.[5] Absent guidance from the Fourth Circuit, this court is bound to adhere to precedent from the Supreme Court and must faithfully apply the *Hosanna-Tabor* factors.[6] Thus, after deciding whether an entity is a religious group, the court must consider: (1) an employee's formal title given to him or her by a religious institution; (2) the substance reflected in the title; (3) an employee's use of the title; and (4) the functions performed by the employee for the religious institution. *See Hosanna-Tabor*, 565 U.S. at 192.

As an initial matter, the court must first decide whether CIU is a religious group under the ministerial exception by examining whether its "mission is marked by clear or obvious religious

---

[5] *See* Leslie C. Griffin, *The Sins of Hosanna-Tabor*, 88 IND. L.J. 981, 1007 (2013) ("The ministerial exception has never been limited to clergy or ordained ministers. The Courts have turned theological cartwheels to transform elementary and secondary school teachers, university and seminary professors, school principals, communications managers, administrative personnel, music directors, organists, and musicians into ministers. The effect has been especially strong on . . . college and university instructors and professors-who the courts have turned into ministers . . . . Several courts relied upon the ministerial exception to dismiss university professors without review of their academic qualifications or employment records."). *See also* Frederick M. Gedicks, *Narrative Pluralism and Doctrinal Incoherence in* Hosanna-Tabor, 64 MERCER L. REV. 405, 429 n.123 (2013) ("Beyond traditional clergy, state and federal courts have characterized administrative secretaries, choir directors, communications mangers, lay administrators, ministerial administrators, music teachers, organists, school teachers, school principals, university professors, organists, public relations personnel, administrators, and pastoral counselors as 'ministers' unprotected by federal or state unemployment statutes or state tort or contract laws." (citations omitted)).

[6] "[A] lower court generally is 'bound to carry the mandate of the upper court into execution . . . .'" *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) (citing *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939)).

characteristics." *See Shaliehsabou*, 363 F.3d at 307-11. Here, CIU "trains Christians for global missions, full-time vocational Christian ministry in a variety of strategic professions, and marketplace ministry." (ECF No. 160-1 at 5.) Moreover, as part of its mission, "[CIU] educates people from a biblical worldview to impact the nations with the message of Christ." (*Id.*) Thus, since CIU "trains Christians" and "educates people from a biblical worldview" (ECF No. 160-1 at 5), it is a religious group under the ministerial exception because it possesses "obvious religious characteristics." *See Shaliehsabou*, 363 F.3d at 307-11. *See also E.E.O.C. v. Catholic Univ.*, 83 F.3d 455, 461 (D.C. Cir. 1996) (applying the ministerial exception to a church-affiliated university); *Adams v. Ind. Wesleyan Univ.*, No. 3:09–CV–468, 2010 WL 2803077, at *9 (N.D. Ind. July 15, 2010) (applying the ministerial exception to a professor at Indiana Wesleyan University).

Finding that CIU is a religious group under the ministerial exception, the court must now turn to whether Yin qualifies as a minister under the exception. *See Shaliehsabou*, 363 F.3d at 307-11. The court will carefully consider the circumstances of Yin's employment, including her (1) formal title; (2) the substance reflected in the title; (3) her use of the title; and (4) the functions performed by Yin at CIU.[7] *See Hosanna-Tabor*, 565 U.S. at 192.

---

[7] While the court agrees with the Report's ultimate conclusion, the court disagrees with the Report's assessment of the *Hosanna-Tabor* factors. (ECF No. 197 at 9, 16.) The Report states that: "The circumstances considered by the Court in *Hosanna-Tabor* included the employee's title, the employer's and employee's representations of the employee's title and duties to the public, the employee's level of training and education in the ministry, and whether the employee's job duties reflected a role in conveying the religious institution's message and carrying out its mission." (*Id.* at 9.) *Hosanna-Tabor* certainly considered these circumstances, however, it places them within an explicit framework consisting of (1) an employee's formal title given to him or her by a religious institution; (2) the substance reflected in the title; (3) an employee's use of the title; and (4) the functions performed by the employee for the religious institution. 565 U.S. at 192. Even though the Report arrives at the correct conclusion, it attempts to expand the scope of the *Hosanna-Tabor* factors. (*See* ECF No. 197 at 15.) Staying true to *Hosanna-Tabor*, this case is much closer than the Report seems to suggest.

Without any dispute between the parties, Yin was a TEFL-ESL instructor (ECF No. 162-16 at 1) and the Director of the TESOL Program (ECF No. 1 at 10). Therefore, Yin's formal title is secular in nature and does not necessarily have a religious connotation. *See Richardson*, 242 F. Supp. 3d at 1145 (finding that an assistant professor of exercise science was a secular title and not in favor of applying the ministerial exception). Indeed, a college professor, one teaching a secular subject, is unlike a kosher supervisor, music teacher at a religious institution, or non-ordained associate in pastoral care. *See Shaliehsabou*, 363 F.3d at 309; *Roman Catholic Diocese*, 213 F.3d at 803; *Rayburn*, 772 F.2d at 1168. Yin even identifies her job title as an "academic professor." (ECF No. 144 at 3.) Thus, the formal title cuts in Yin's favor and against applying the ministerial exception.

In regard to the substance reflected in Yin's title, her position "facilitate[d] student growth in biblical knowledge, spiritual maturity, ministry orientation, and the professional skills necessary for service in a variety of cultural contexts." (ECF No. 162-16 at 1.) Additionally, the TEFL-ESL instructor was "called upon to embody and to implement CIU's purpose and mission" (ECF No. 162-16 at 1), which necessarily included training Christians for ministry and educating students from a biblical worldview in order to spread the message of Christ (ECF No. 160-1 at 5). Substantively, the TEFL-ESL position suggests that Yin was expected "to live, teach, and promote a life of godly choices and Christian growth" like every other faculty member at CIU. (ECF No. 159-3 at 11.) Although CIU states that Yin's Christian education at Oral Roberts was an important consideration in its decision to hire her (ECF No. 162-11 at 9), that fact is of minimal value because Yin did not obtain a theological degree from Oral Roberts and she possessed secular degrees from other non-religious institutions. (*See* ECF No. 1-2 at 1.) A court must objectively examine the substance reflected in an employee's title and is not required to give complete deference to a

religious institution's subjective reasons for hiring an employee. *See Hosanna-Tabor*, 565 U.S. at 191-92. *Hosanna-Tabor* did not give such deference to the religious institution when evaluating the substance of a religious title, and this factor seemed to turn Perich's "significant degree of religious training." *Id.* Nevertheless, even though Yin does not have formal training in religion or theology, her position has substantive religious duties reflected within the title as indicated by the job description. *See Fratello*, 863 F.3d at 207-08 (finding that the substance reflected in the title of a parochial school's principal, even though the principal did not have formal training in religion, weighed in favor of applying the ministerial exception). Therefore, this factor is in favor of applying the ministerial exception.

The court must next consider Yin's use of her title. *See Hosanna-Tabor*, 565 U.S. at 192. In *Hosanna-Tabor*, the Supreme Court was persuaded that Perich "held herself out as a minister of the Church" by accepting a formal call to religious service, claiming a special housing allowance in the exercise of ministry, and indicating her ministerial status on forms relating to her termination. *Id.* at 191-92. In the instant case, there is no indication that Yin held herself out as a minister because, unlike Perich in *Hosanna-Tabor*, she did not claim a special housing allowance as a minister, nor are there any documents indicating that she considered herself to be a minister. (ECF Nos. 1, 207.) Although Yin was required to be part of "a ministry in a biblical sense" (ECF No. 159-5 at 40) and engaged in activities relating to the Christian faith (ECF No. 152 at 10-11, 15; ECF No. 159-2 at 15; ECF No. 162-11 at 11-12), nothing indicates that *she understood* that she would be considered a religious leader or minister at CIU. *See Richardson*, 242 F. Supp. 3d at 1145 ("[A]lthough there is ample evidence that plaintiff held herself out as a *Christian*, there is no evidence that she held herself out as a *minister*."). *But see Fratello*, 863 F.3d at 208 (holding that

a principal of a parochial school "understood that she would be perceived as a religious leader"). Therefore, this factor counsels against applying the ministerial exception to Yin's case.

Lastly, the court must consider the functions performed by Yin at CIU. *See Hosanna-Tabor*, 565 U.S. at 192. In *Hosanna-Tabor*, this factor was in favor of the ministerial exception's application because Perich was charged with "conveying the Church's message and carrying out its mission." *Id.* Specifically, she was "charged . . . with 'lead[ing] others toward Christian maturity' and 'teach[ing] faithfully the Word of God, the Sacred Scriptures, in its truth and purity and as set forth in all the symbolical books of the Evangelical Lutheran Church." *Id.* (citation omitted). Additionally, "she took her students to school-wide chapel service, and . . . took her turn leading it, choosing the liturgy, selecting the hymns, and deliver a short message based on verses from the Bible." *Id.* The court finds that the Supreme Court's analysis in *Hosanna-Tabor* is extremely applicable to the instant case. Under these specific facts, Yin required her students to pray together over the course of the semester, integrated biblical materials into her courses, and prepared students for ministry roles. (ECF No. 152 at 10-11; ECF No. 159-2 at 15; ECF No. 162-11 at 11-12.) While at CIU, Yin led the Advisor/Advisee Chapels and determined the content of those meetings. (ECF No. 162-11 at 11.) She also regularly encouraged students to "follow the Lord's calling and live out the faith." (ECF No. 151-12 at 3.) Thus, this factor, which the court weighs heavily, is in favor of applying the ministerial exception.

On the one hand, two of the *Hosanna-Tabor* factors weigh in favor of applying the ministerial exception and are in CIU's favor, the substance of Yin's title and the religious functions performed by Yin. On the other hand, two of the factors weigh against the ministerial exception and are in Yin's favor, Yin's formal title and her use of that title. However, according to the United States Court of Appeals for the Seventh Circuit, "even referring to them as 'factors' denotes the

kind of formulaic inquiry that the Supreme Court has rejected" and it is appropriate to consider the factors holistically. *Grussgott*, 882 F.3d at 661-62 (reasoning that *Hosanna-Tabor* imposes a totality of the circumstances test when considering all of the facts and factors of a case). *See also Cannata*, 700 F.3d at 177 ("[T]he Hosanna-Tabor Court eschewed a 'rigid formula' and the application of a bright-line test in ministerial exception cases." (citation omitted)). In this case, Yin required her students to pray, prayed with her students, led students during Advisor/Advisee Chapels, integrated biblical materials into her courses, and prepared students for ministry roles (ECF No. 152 at 10-11; ECF No. 159-2 at 15; ECF No. 162-11 at 11-12). *But see Richardson*, 242 F. Supp. 3d at 1145 (declining to find that a professor of exercise science qualified as a minister under the ministerial exception when, among other facts, "she was charged with no religious duties such as taking students to chapel or leading them in prayer"). Moreover, Yin believed that God brought her to CIU and even led a group during a university-wide Prayer Day. (ECF No. 152 at 10, 16.) While this is an extremely close case, it seems that Yin's position was "important to the spiritual and pastoral mission of the church." *Rayburn*, 772 F.2d at 1169. Most importantly, based upon the description of the job position, it seems that Yin had notice of possible "ministry responsibilities," and she decided to knowingly undertake those responsibilities during her tenure at CIU. (ECF No. 151-8 at 2; ECF No. 162-11 at 11.) As such, in accordance with the *Hosanna-Tabor* factors and under these specific circumstances, the court concludes that Yin is a minister under the ministerial exception.[8]

---

[8] The Fourth Circuit has yet to address whether its primary duties test under *Roman Catholic Diocese* has survived *Hosanna-Tabor*. In *Roman Catholic Diocese*, the Fourth Circuit reiterated that the "[t]he general rule is that 'if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered clergy.'" 213 F.3d at 801 (quoting *Rayburn*, 772 F.2d at 1169). It seems that *Hosanna-Tabor* has displaced this rule and calls for a more holistic analysis that considers all of the underlying circumstances. 565 U.S. at 190-95.

The ministerial exception does not require "a rigid formula for deciding when an employee qualifies as a minister." *Hosanna-Tabor*, 565 U.S. at 190. Consequently, the court declines to hold that every professor at CIU qualifies as a minister. *See Fratello*, 863 F.3d at 206 ("[W]e do not accept the defendants' argument that all parochial-school principals should be presumed ministers within the meaning of the exception. . . . [A]ny such categorical presumption runs counter to the teaching of *Hosanna-Tabor* . . . . In each case, therefore, we must assess the *specific circumstances* of employment." (emphasis added)). Indeed, there may be professors at CIU that perform few, if any, religious functions. *Id.* Notwithstanding that consideration, the court will address those issues on a case-by-case basis. *See Hosanna-Tabor*, 565 U.S. at 196 ("There will be time enough to address the applicability of the exception to other circumstances if and when they arise."). Until that time arrives, the court concludes that Yin, and only Yin, qualifies as a minister under the ministerial exception.

## IV. CONCLUSION

After a thorough review of Yin's Objection (ECF No. 207) and the Magistrate Judge's Report (ECF No. 197), the court **ACCEPTS IN PART** the Magistrate Judge's Report and Recommendation (ECF No. 197), **DENIES** Yin's Motion for Summary Judgment (ECF No. 144), and **GRANTS** Columbia International University's Motion for Summary Judgment (ECF No. 159). Accordingly, Columbia International University's Motion to Strike (ECF No. 213) is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

September 30, 2018
Columbia, South Carolina